**In Re Joanne G. BURNS, Debtor.**

**Joanne G. BURNS, Plaintiff–Appellee,**

**v.**

**UNITED STATES of America, Acting by and Through the INTERNAL REVENUE SERVICE, Defendant–Appellant.**

**No. 89–8127.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 13, 1989.

Gary R. Allen, Chief, Appellate Section, U.S. Dept. of Justice, Tax Div., Kevin M. Brown, Gary D. Gray, Washington, D.C., for defendant-appellant.

Richard A. Childs, Columbus, Ga., for plaintiff-appellee.

Before JOHNSON, Circuit Judge, RONEY *, Senior Circuit Judge, and MELTON **, District Judge.

MELTON, District Judge:

Joanne G. Burns, the Debtor, initiated an adversary proceeding in the bankruptcy court to determine the priority status, amount and dischargeability of her federal income tax liabilities for the years 1977 through 1981, 1983 and 1985, together with penalties assessed thereon and accrued interest, for which the Internal Revenue Service ("IRS") had filed a claim in her Chapter 13 case. The parties resolved many

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Howell W. Melton, U.S. District Judge for the Middle District of Florida, sitting by designation.

issues by agreement, leaving for the bankruptcy court the questions of dischargeability of penalties and interest related to unpaid taxes for the calendar years 1977 through 1980. The bankruptcy court ruled that interest accruing on these unpaid taxes prior to Burns' filing for Chapter 7 bankruptcy in 1984 (pre-petition interest) was not dischargeable because the tax liabilities themselves were not dischargeable. The bankruptcy court further ruled that both the interest accruing after the Chapter 7 filing (post-petition interest) and the fraud penalties associated with those tax years were discharged by that earlier bankruptcy proceeding. The IRS appealed the rulings on post-petition interest and fraud penalties and the district court affirmed.[1] The IRS now appeals to this court. We reverse the ruling on the dischargeability of the post-petition interest and affirm the ruling on the dischargeability of the fraud penalties.

## FACTS

Burns filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 101–1103 (1982), on January 27, 1984. The IRS did not file a proof of claim in that proceeding, although penalties and interest had been assessed against Burns regarding her tax filings for years 1977 through 1979.[2] In June of 1984 the bankruptcy court entered an order of discharge.

On May 28, 1987, Burns filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code. In this second proceeding, the IRS filed its proof of claim for taxes, interest and penalties for taxable years 1977 through 1981, 1983 and 1985. Approximately $7,688.82 in post-petition interest related to unpaid taxes for years 1977 through 1979 and an additional $2,999.11 represented fraud penalties, levied pursuant to 26 U.S.C. § 6653(b)(1), for those same years.

Burns initiated a proceeding in the bankruptcy court to determine, *inter alia*, her liability for the post-petition interest and the fraud penalties. She contended that her discharge in the Chapter 7 proceeding had terminated her liability on the post-petition interest and the penalties. The IRS contested the proposition that the prior proceeding discharged her tax obligations. Section 727 of the Bankruptcy Code provides for discharge of "all debts that arose before the date of the order for relief under [Chapter 7], and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case," 11 U.S.C. § 727(b) (1982), excepting those types of debts enumerated in section 523(a) as nondischargeable. While the parties agreed that the underlying unpaid taxes were not discharged in the Chapter 7 proceeding, they disagree on the status of the post-petition interest and the fraud penalties.

Regarding the post-petition interest, Burns conceded that prior to the passage of the Bankruptcy Code the Supreme Court, in *Bruning v. United States*, 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964), held that post-petition interest on a nondischargeable tax debt could be recovered in a later action against the debtor personally. Burns argued, however, that the fresh start policy of the Bankruptcy Code abrogated the *Bruning* rule. Regarding the fraud penalties, Burns contended that the plain language of section 523(a)(7)(B) provides discharge to penalties relating to a transaction or event occurring more than three years prior to the filing of a bankruptcy petition. Since her tax returns for 1977 through 1979 are transactions or events occurring more than three years prior to her 1984 Chapter 7 filing, Burns reasoned that the penalties associated therewith are discharged.

The bankruptcy court accepted Burns' arguments. Her liabilities for the post-petition interest and penalties were ordered

---

1. Burns has left undisturbed the ruling on pre-petition interest.

2. Although Burns sought a determination of her liabilities for 1980, the final order of the bankruptcy court reveals that neither penalties nor post-petition interest are owing for that year. Accordingly, we hereinafter focus on the three relevant years, 1977, 1978 and 1979.

discharged. On appeal, the district court affirmed the bankruptcy court's ruling. From the adverse ruling of the district court, the IRS initiated this appeal. Because the issues presented concern questions of law, review is plenary.

### DISCUSSION

We must determine if the nondischargeability of Burns' tax liabilities also exempts from discharge the post-petition interest and fraud penalties assessed on those nondischargeable liabilities. These issues of statutory interpretation arise as ones of first impression in this Circuit. The issues presented are discussed individually.

#### Post–Petition Interest

The nondischargeability of interest accruing after a prior bankruptcy filing on nondischargeable tax liabilities was firmly established prior to the enactment of the Bankruptcy Code. *See Bruning v. United States*, 376 U.S. 358, 360, 84 S.Ct. 906, 907–08, 11 L.Ed.2d 772 (1964). Subsequent to the Code, however, courts have split over the continuing viability of *Bruning*. *Compare, e.g., In re Hanna*, 872 F.2d 829, 830–31 (8th Cir.1989), *Geving v. United States*, 93 B.R. 742, 743–44 (D.Wyo.1986), *In re Cline*, 100 B.R. 660, 662–63 (Bankr. W.D.N.Y.1989) *and In re Mitchell*, 93 B.R. 615, 617–18 (Bankr.W.D.Tenn.1988) (Congress intended to codify principle enunciated in *Bruning* concerning nondischargeability of post-petition interest) *with In re Reich*, 66 B.R. 554, 557–58 (Bankr.D.Colo. 1986) *and In re Frost*, 19 B.R. 804, 810 (Bankr.D.Kan.1982) ("fresh start" policy of Bankruptcy Code undermined rationale of *Bruning* ), *vacated on relevant ground as unripe*, 47 B.R. 961 (D.Kan.1985).

■ Congress is presumed to act with full awareness of the well-established judicial interpretation on the issue of post-petition interest, *see, e.g., Rodriguez v. United States*, 480 U.S. 522, 525, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (per curiam), and, when statutory language permits interpretation, pre–Code interpretations are presumed to have survived the enactment of the Bankruptcy Code unless Congress has expressed an intention to change the interpretation of judicially created concepts in enacting the Code, *see United States v. Ron Pair Enterprises, Inc.*, 489 U.S. ——, 109 S.Ct. 1026, 1031–33, 103 L.Ed.2d 290 (1989). In *Hanna*, the Eighth Circuit thoroughly analyzed congressional intent regarding the *Bruning* rule, concluding that Congress did not intend to change the pre-Code law. *See* 872 F.2d at 830–31. We concur in the *Hanna* analysis and, in lieu of filling the tomes that record appellate opinions with a repeat of its proofs, we adopt that analysis as our own. Inasmuch as we conclude that the post-petition interest on a nondischargeable tax debt is nondischargeable, the rulings of the courts below must be reversed.

#### Tax Penalties

Pre–Code law was silent on the dischargeability of liability for tax penalties. *See* Plumb, *The Tax Recommendations of the Commission on Bankruptcy Laws— Priority and Dischargeability of Tax Claims*, 59 Cornell L.Rev. 991, 1058 (1974). Courts generally took the position that the penalties survived a discharge in bankruptcy, resting either on the theory that the penalties constituted a nonprovable debt or on the theory that the penalties were to be treated in all respects as taxes because they were assessed and collected in the same manner as taxes. *See id.* The second of these theories linked the dischargeability of the penalty with the underlying tax liability. *Id.* The IRS pursued tax penalties in accord with the second theory during the ten years immediately preceding enactment of the Bankruptcy Code. *See* Rev.Rul. 68–574, 1968–2 C.B. 595, 597 (superceding Rev.Rul. 62–96, 1962–1 C.B. 308). The Commission on Bankruptcy Laws had the intention of clarifying and rationalizing the dischargeability status of various pen-alties, including tax penalties, when it proposed a predecessor to section 523(a)(7) of the Bankruptcy Code. *See* Plumb, *supra*, 59 Cornell L.Rev. at 1059; Report of the Comm'n on the Bankruptcy Laws of the United States, Part II, H.R.Doc. No. 137, Pt. II, 93d Cong., 1st Sess. 141 (1973) (Pro-

posed Bankruptcy Act of 1973, Note 18 to § 4–506).

### A.

■ Section 523(a)(7), then, innovates on the matter of tax penalties. *Cf. Kelly v. Robinson,* 479 U.S. 36, 51, 107 S.Ct. 353, 362, 93 L.Ed.2d 216 (1987) (§ 523(a)(7) codifies pre–Code law on fines and penalties generally); *id.* at 50 n. 13, 107 S.Ct. at 361–62 n. 13 (tax penalties treated differently). It provides, in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(7) to the extent such debt is for a fine, penalty or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty—

(A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or

(B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition; ....

11 U.S.C. § 523(a)(7) (1982). While the language of this subsection frames nondischargeable tax penalties as an exception to an exception to an exception, once the triple negative is taken into account the meaning of the provision gains clarity.[3] A tax penalty is discharged if the tax to which it relates is discharged (in the precise terms of the statute, not nondischargeable) or if the transaction or event giving rise to the penalty occurred more than three years prior to the filing of the bankruptcy petition. Since the statute uses the disjunctive, a tax penalty that does not qualify for discharge under one of the two aforementioned circumstances may still qualify under the other.

■ Because the Bankruptcy Code introduced a sweeping overhaul to a substantial part of the system, "it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *Ron Pair,* 489 U.S. at ——, 109 S.Ct. at 1030. We must therefore look to the language of section 523(a)(7) itself, and where, as here, that language is plain, we must enforce it according to its terms. *Id.* Those terms provide that Burns' tax penalties were not exempt from the discharge entered in her Chapter 7 case.

### B.

The IRS proposes that we look beyond the statute to the statements of the floor managers for the bill that became the Bankruptcy Code. To do so, of course, requires that we find ambiguity in section 523(a)(7). *See, e.g., Ron Pair,* 489 U.S. at ——, 109 S.Ct. at 1031; *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982); *TVA v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978). Although the IRS describes the statute as awkwardly worded, the argument concerning ambiguity is elusive. In order to find an ambiguity, the government summarily concludes that the statute can be fairly read in another fashion and suggests the authority of two cases, *Cassidy v. Commissioner,* 814 F.2d 477 (7th Cir. 1987), and *Carlton v. IRS,* 19 B.R. 73 (D.N. M.1982). It is noteworthy that *Cassidy* does not engage in an analysis of the ambiguity, or lack thereof, in section 523(a)(7). Rather, the opinion casts its reliance on a Senate report (with which, for reasons that will be set forth *infra,* we must respectfully disagree) without finding the predicate ambiguity for reliance on an extrinsic aid for interpretation. *Carlton,* on the other

---

**3.** In *Robinson,* 479 U.S. at 50, 107 S.Ct. at 361, the Supreme Court concluded that the portion of section 523(a)(7) that precedes the tax penalty exception "is subject to interpretation." That case, however, considered the question whether restitution qualified within the "fines, penalties or forfeitures" language of the statute. The finding of ambiguity in that portion of the sentence does not form a basis to challenge the unambiguous language of the autonomous provision on tax penalties.

hand, found ambiguity on the face of the statute, positing

> [i]t is not clear from a reading of the statute whether subsection (B) is intended to limit subsection (A), or whether the language "transaction or event" refers to something other than the computation of a tax penalty by reference to a tax liability, which is dealt with in subsection (A). If the latter was the construction Congress intended then the IRS' interpretation is correct.

19 B.R. at 74. We are not persuaded by *Carlton*'s reasoning. It reads more into section 523(a)(7) than the language will yield. "There is nothing in the code that says that if penalties do not come within the provisions of subsection (A) they cannot become dischargeable within the provisions of subsection (B)." *In re Roberts*, 94 B.R. 707, 709 (Bankr.N.D.Okla.1989). The use of the disjunctive, without further qualification of either subsection, leaves no doubt that Congress intended to create two independent measures for the dischargeability of tax penalties. *See, e.g., Garcia v. United States*, 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) ("terms connected by a disjunctive [should] be given separate meaning unless the context dictates otherwise"); *FCC v. Pacifica Foundation*, 438 U.S. 726, 739–40, 98 S.Ct. 3026, 3035, 57 L.Ed.2d 1073 (1978). "The language before us expresses Congress' intent ... with sufficient precision so that reference to legislative history and to pre-Code practice is hardly necessary." *Ron Pair*, 489 U.S. at ——, 109 S.Ct. at 1030.

The positions of the parties could easily progress into an abstract discussion on the role of legislative history in judicial interpretation of statutes, a debate that currently is receiving extensive airing among our colleagues on the bench. *See* Rothfield, *Judging Law: Never Mind What Congress Meant?*, N.Y.Times, April 14, 1989, at 19, col. 3; *see also In re Sinclair*, 870 F.2d 1340 (7th Cir.1989) (raising pros and cons

of using legislative history). Fortunately, we need not weigh into that fight. As the Supreme Court observed recently in *Ron Pair*, 489 U.S. at ——, 109 S.Ct. at 1030, the Bankruptcy Code's origins counsel in favor of emphasizing plain meaning interpretation of its provisions.

Whatever degree of solicitude is due to legislative history materials in the usual case, "[s]trict adherence to the language and structure of the Act is particularly appropriate where, as here, a statute is the result of a series of carefully crafted compromises." *Community for Creative Non–Violence v. Reid*, 490 U.S. ——, 109 S.Ct. 2166, 2177 n. 14, 104 L.Ed.2d 811 (1989) (Copyright Act of 1976); *see also Rodriguez v. Compass Shipping Co.*, 451 U.S. 596, 617, 101 S.Ct. 1945, 1957–58, 68 L.Ed.2d 472 (1981) (Longshoremen's & Harbor Workers' Compensation Act); *United States v. Sisson*, 399 U.S. 267, 291–99, 90 S.Ct. 2117, 2130–34, 26 L.Ed.2d 608 (1970) (Criminal Appeals Act). There can be no doubt that the Bankruptcy Code "was the result of a series of last minute conferences and compromises between the managers of both Houses." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 61 n. 12, 102 S.Ct. 2858, 2866 n. 12, 73 L.Ed.2d 598 (1982) (plurality opinion). Accordingly, the best indicators of congressional intent in this narrow instance are the language and structure of the Code itself, not the accompanying statements of legislators that carry the potential for reclaiming that which was yielded in the actual drafting compromise.[4] "Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent." *Board of Governors v. Dimension Fin. Corp.*, 474 U.S. 361, 374, 106 S.Ct. 681, 689, 88 L.Ed.2d 691 (1986).

### C.

The soundness of our approach is persuasively demonstrated by comparing the

---

4. If we err by following this approach, we do so with the knowledge that Congress is capable of crafting appropriate relief. *See Board of Governors v. Dimension Financial Corp.*, 474 U.S. 361, 374 n. 7, 106 S.Ct. 681, 689 n. 7, 88 L.Ed.2d 691 (1986).

result to an analysis of the legislative history materials concerning section 523(a)(7). The IRS would have us rest on the authority of the report of the Senate Judiciary Committee and the so-called "Joint Statement" made by the floor managers of the bill (H.R.8200), Representative Edwards and Senator DeConcini. A close examination of these two sources casts doubt on their value, and a broader investigation into the circumstances that preceded the present form of section 523(a)(7) suggests a conclusion more in line with the textual analysis in which we have already engaged.

The Senate Judiciary Committee, of which Senator DeConcini chaired the relevant subcommittee, reported the following about S.2266, the draft of the bill which it considered[5]:

Paragraph (7) makes nondischargeable certain liabilities for penalties including tax penalties if the underlying tax with respect to which the penalty was imposed is also nondischargeable (sec. 523(a)(7)). These latter liabilities cover those which, but are penal in nature, as distinct from so-called "pecuniary loss" penalties which, in the case of taxes, involve basically the collection of a tax under the label of a "penalty." This provision differs from the bill as introduced, which did not link the nondischarge of a tax penalty with the treatment of the underlying tax. The amended provision reflects the existing position of the Internal Revenue Service as to tax penalties imposed by the Internal Revenue Code (Rev.Rul. 68–574, 1968–2 C.B. 595).

S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5865. The Seventh Circuit Court of Appeals in *Cassidy* treated this piece of legislative history as dispositive of the tax penalty dischargeability issue. *See* 814 F.2d at 481. The fundamental flaw in this reliance lies in the text of the proposed legislation before the committee at that time. It provided that an order of discharge did not discharge any debt

to the extent such debt is for a fine, penalty, addition to tax, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, except that this paragraph shall not apply to a fine, penalty, or addition to tax under any law imposing a tax if the tax to which such fine, penalty, or addition to tax relates is entitled to discharge under paragraph (1) of this subsection; ....

S.2266, 95th Cong., 2d Sess. § 523(a)(7) (1978) (as reported by Senate Judiciary Committee). In short, although the Senate Judiciary Committee proposal had language which tracks subsection 523(a)(7)(A), it did not have an equivalent to subsection 523(a)(7)(B), the crucial subsection at issue. The report from that committee accordingly fails to assist in the inquiry to find the meaning of the statute as enacted. *Cf. Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1196–97 (7th Cir.1989) (earlier committee reports not useful to interpret subsequently amended statutory provisions).

The next change in the language for the proposed section 523(a)(7), and the first appearance of the language of subsection (B), took place in the Senate Finance Committee. Following the Senate Judiciary Committee report, portions of S. 2266, including section 523, were sequentially referred to the Finance Committee for expedited consideration. *See generally* Klee, *Legislative History of the New Bankruptcy Code*, 54 Am.Bankr.L.J. 275, 287–88 (1980) (reprinting 28 DePaul L.Rev. 941 (1979)). As amended by the Senate Finance Committee, section 523(a)(7) exempted from discharge any debt

to any extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit and is not compensation for actual pecuniary loss, except that this paragraph shall not apply to a penalty under any law imposing a tax unless—

---

**5.** H.R. 8200 identifies the bill that eventually passed both houses. The Senate considered S. 2266 until September 7, 1978. At that time it called up H.R. 8200, as the bill passed by the House of Representatives, and amended it by striking out its contents in their entirety, substituting therein the contents of S.2266.

(A) the penalty is computed by reference to the amount of a tax liability of the debtor which is nondischargeable under paragraph (1) of this section; or

(B) the penalty is imposed with respect to a transaction or event which occurred during the three years immediately before the date of the filing of the petition;
. . . .

S.2266, 95th Cong., 2d Sess. § 523(a)(7) (1978) (as amended and reported by Senate Finance Committee). The committee report explains:

A second committee amendment adds to the rules concerning nondischargeability of tax penalties (contained in subsection (a)(7) of this section) a further rule for penalties which, under the Internal Revenue Code (or State or local tax law), are not computed by reference to a specific principal amount of tax liability. ... The amendment makes tax penalties of these kinds nondischargeable only if the transaction or event giving rise to the penalty occurred during the 3 years immediately before the date on which the petition under title 11 was filed.

S.Rep. No. 1106, 95th Cong., 2d Sess. 23 (1978). The policy set forth in this passage provides the rationale not only for the addition of subsection (B), but also for the significantly revised language of subsection (A). Consequently, the Senate Finance Committee report is seemingly more useful than the Judiciary Committee report, but the Finance Committee report faces a limitation on its usefulness stemming from the more precise wording of section 523(a)(7)(A) in this earlier draft of the statute.

The task of reconciling all the differences between the House and Senate bankruptcy bills was, by an insider's account,[6] accomplished by something of a Herculean effort. *See* Klee, *supra*, 54 Am.Bankr.L.J. at 288–93. Point in fact, "[t]he process by which all the differences were resolved and many features added to the legislation remain rather mysterious, not to say unortho-

dox." Kennedy, *The Background of the Bankruptcy Reform Act of 1978*, 1979 Ann.Surv.Bankr.L. 1, 14. In the case of section 523(a)(7), the House version paralleled the Senate language, as amended by the Finance Committee, except that the House did not include any "exceptions to the exceptions" language for tax penalties. *See* H.R. 8200, 95th Cong., 2d Sess., 124 Cong.Rec. S1,582 (daily ed. Feb. 8, 1978) (engrossed copy). That is, the House bill would have placed tax penalties outside the categories of nondischargeable debts enumerated in section 523(a)(7). *See Kelly v. Robinson*, 479 U.S. at 50 n. 13, 107 S.Ct. at 362 n. 13 (explaining that "compensation for actual pecuniary loss" language was intended to prevent application of § 523(a)(7) to tax penalties). There was, then, a sizable gap to bridge with the instant statute, as there was for the remainder of the Bankruptcy Code as well.

To reconcile the House and Senate bills in a timely fashion, the traditional method of appointing conferees and convening a conference committee was bypassed. Instead, the managers of the legislation in the two Houses met to resolve informally the differences between the bills. *See* Klee, *supra*, 54 Am.Bankr.L.J. at 290. They reported back their proposal, issuing the Joint Statement, in their capacity of chairmen of their respective subcommittees, explaining their changes. *See* 124 Cong.Rec. 32392 (1978) (statement of Rep. Edwards); *id.* at 33992 (statement of Sen. DeConcini). Of section 523(a)(7), the Joint Statement made two mentions.

Section 523(a)(7) of the House amendment adopts the position taken in the Senate amendment and rejects the position taken in the House bill. A penalty relating to a tax cannot be nondischargeable unless the tax itself is nondischargeable.

*Id.* at 32399, 33998.

The House amendment also adopts the Senate amendment provision limiting the nondischargeability of punitive tax penal-

---

6. Kenneth Klee served as staff counsel to the House Judiciary Committee during the period of bankruptcy law reform. For this reason, it has been suggested that his article may be suspect. *See In re Virtual Network Servs. Corp.,* 98 B.R. 343, 345–46 (N.D.Ill.1989).

ties, that is, penalties other than those which represent collection of a principal amount of tax liability through the form of a "penalty." Under the House amendment, tax penalties which are basically punitive in nature are to be nondischargeable only if the penalty is computed by reference to a related tax liability which is nondischargeable or, if the amount of the penalty is not computed by reference to a tax liability, the transaction or event giving rise to the penalty occurred during the 3–year period ending on the date of the petition.

*Id.* at 32417, 34016. The IRS proposes that we confer on the Joint Statement the same weight we would give to a conference committee report.[7] *Cf. Gemsco, Inc. v. Walling,* 324 U.S. 244, 264, 65 S.Ct. 605, 616, 89 L.Ed. 921 (1945). Some authorities grant the Joint Statement this kind of status. *See In re Timbers of Inwood Forest,* 793 F.2d 1380, 1398–99 & n. 33 (5th Cir.1986) (discussing Joint Statement's weight as equivalent to conference committee report), *vacated,* 802 F.2d 777, *reinstated on reh'g en banc,* 808 F.2d 363, 364 (5th Cir.1987), *aff'd,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *In re Spong,* 661 F.2d 6, 10 (2d Cir.1981) ("These remarks, offered in lieu of a conference report by the principal sponsors of the Act, are entitled to

great weight"); *see also Hoffman v. Connecticut Dep't of Income Maintenance,* 492 U.S. ——, 109 S.Ct. 2818, 2827 n. 6, 106 L.Ed.2d 76 (1989) (Marshall, J., dissenting) (erroneously referring to Rep. Edwards and Sen. DeConcini as "the members of the Conference Committee" on the bill that became the Bankruptcy Code); *In re Shank,* 792 F.2d 829, 834 (9th Cir.1986) (Reinhardt, J., dissenting) ("The Joint Statement *is* the legislative history of the Bankruptcy Code."); 4 *Norton Bankr. L. & Prac.* xxiii n. 1 (1988–89 ed.) ("these statements, as a concensus [sic] of these committee leaders, carry a weight in the legislative history equal to a conference report."); Klee, *supra,* 54 Am.Bankr.L.J. at 294–97 (setting forth hierarchy of legislative history sources with Joint Statement at top of hierarchy); Klee & Merola, *Ignoring Congressional Intent: Eight Years of Judicial Legislation,* 62 Am.Bankr.L.J. 1, 3–4 (1988).

We do not agree that the Joint Statement should be given the dispositive weight that the IRS urges. The process by which Representative Edwards and Senator DeConcini reconciled the bills does not carry the indicia of reliability central to the value attached to the conference committee system.[8] H.R. 8200, in the form shaped by

---

**7.** Were we to accept this invitation, we would not alter our result, for even a conference report cannot overrule the clear direction of the statute itself. *E.g., Aloha Airlines v. Director of Taxation,* 464 U.S. 7, 12, 104 S.Ct. 291, 294, 78 L.Ed.2d 10 (1983); *In re Erickson Partnership,* 856 F.2d 1068, 1069–70 (8th Cir.1988); *Squillacote v. United States,* 739 F.2d 1208, 1218 (7th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 302 (1985).

We note that the decision regarding what weight to accord the Joint Statement is of considerable recurring moment in the application of the Bankruptcy Code. *See, e.g., In re Curtis,* 83 B.R. 853, 859–61 (Bankr.S.D.Ga.1988); *In re Central Foundry Co.,* 45 B.R. 395, 404–06 (Bankr.N.D.Ala.1984); *In re Cox,* 33 B.R. 657, 661 n. 3 (Bankr.M.D.Ga.1983); *In re Thomas,* 12 B.R. 765, 767–68 (Bankr.N.D.Ga.1981).

**8.** The conference process has special status in the legislative system. Only differences between the bills can be negotiated; areas of agreement are not revisited. *See* W. Brown, *Constitution, Jefferson's Manual and Rules of the House of Representatives of the United States,* 100th Cong., H.R.Doc. No. 248, § 546, at 271–72

(1988) [hereinafter *Jefferson's Manual*]; L. Slack, *Senate Manual Containing the Standing Rules, Orders, Laws, and Resolutions Affecting the Business of the United States Senate,* 100th Cong., S.Doc. No. 1, §§ 155–160, at 199–200 (1988) [hereinafter *Senate Manual*] (reprinting with revision notes Cleaves' Manual of the Law and Practice in Regard to Conferences and Conference Reports) (adopting House Rules from *Jefferson's Manual* with annotations). The membership of the conference committee is traditionally elite. It includes the bills' sponsors and authors, committee chairmen, majority members, and floor managers from both houses whose task is to work out the differences between the bills. *Jefferson's Manual,* § 536, at 267; *Senate Manual,* § 143.1, at 197. Under the House rules, the meeting of the conferees must be public unless a roll call vote decides it will be closed. *Jefferson's Manual,* § 548, at 272.

The conference report is privileged and must be accepted or rejected in its entirety. *Jefferson's Manual,* § 549, at 273; *Senate Manual,* § 177, at 202. The conference report must provide a joint explanatory statement sufficiently detailed to inform the House and the Senate of

Representative Edwards and Senator De-Concini, lacked conference bill status. *See* Klee, *supra,* 54 Am.Bankr.L.J. at 202. Consequently, the key reason for preferring the statements of a conference report—its status as " 'the final statement of terms agreed to by both houses,' " *In re Timbers of Inwood Forest,* 793 F.2d at 1399 n. 33 (quoting *Demby v. Schweiker,* 671 F.2d 507, 510 (D.C.Cir.1981) (opinion of MacKinnon, J.))—does not apply to the Joint Statement that accompanied H.R. 8200. *Cf. National Ass'n of Greeting Card Publishers v. U.S. Postal Service,* 462 U.S. 810, 832 n. 28, 103 S.Ct. 2717, 2731 n. 28, 77 L.Ed.2d 195 (1983) (refusing to treat House Managers' Statement appended to conference report of Postal Reorganization Act as equivalent to conference report). Indeed, several significant amendments to the bill (although none involving section 523(a)(7)) were adopted subsequent to the offering of the Joint Statement. *See* Klee, *supra,* 54 Am.Bankr.L.J. at 290–93.

The Joint Statement is properly viewed as a statement by the sponsors of H.R. 8200. While it is then treated as a somewhat useful piece of legislative history, "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). This is the view of the Joint Statement taken by most courts of appeal. *See, e.g., In re Kelly,* 841 F.2d 908, 912 n. 3 (9th Cir.1988) ("Stray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted on the bill."); *Wamsganz v. Boatmen's Bank,* 804 F.2d 503, 505 (8th Cir.1986) (analyzing committee reports and Joint Statement without preferring either source, with passing reference to Senator DeConcini as "one of the legislative leaders in the passage of the Bankruptcy Code"); *In re Shank,* 792 F.2d 829, 831–33 (9th Cir.1986) (relying on "entire history of" bankruptcy code provision, explicitly rejecting sole reliance on Joint Statement, although it is given consideration as part of whole history); *In re Salem Mortgage Co.,* 783 F.2d 626, 632–34 & n. 17 (6th Cir.1986) (examining primarily committee reports and language of successive drafts, with passing reference to "floor managers' joint explanatory statement"); *Unsecured Creditors' Committee v. Walter E. Heller & Co. Southeast, Inc.,* 768 F.2d 580, 583–85 (4th Cir.1985) (engaging in chronological analysis of progression of bill and referring to Joint Statement as "reinforc[ing] an interpretation of congressional intent behind § 506(b) which is apparent from the legislative process itself"); *DeChiaro v. New York State Tax Comm'n,* 760 F.2d 432, 435–36 (2d Cir.1985) (preferring Senate Judiciary and Finance committee reports to Joint Statement, which is described as "some remarks in floor debate on the

---

the effect the amendments in the report will have on the related sections of the bills sent to the conference. Deschler & Brown, *Procedure in the United States House of Representatives,* 97th Cong., ch. 33 § 13.1, at 742 (1982); *Senate Manual,* § 163–65, at 200–01. Minority and supplemental reports may not be filed in connection with a conference report. *Jefferson's Manual,* § 543, at 271. The conference report is considered first by the house of Congress that agreed to the conference, and if it is agreed to in that house, then forwarded for consideration to the other chamber. *Jefferson's Manual,* § 549, at 273; *Senate Manual,* § 161, at 200.

The process, as briefly described above, establishes an open, specialized method for resolving conflicts between the houses of Congress. When the rules are not followed, such as inclusion of nongermaine amendments or proposals outside the scope of the conference, an objection raised to the violation will prevent consideration of the conference report. *See* Deschler & Brown, *supra,* ch. 28 §§ 20.11–20.15 (giving examples). The constraints imposed by the rules governing conference reports give credence to a judicial inference regarding the reasonable range of interpretations that are available following conference committee action. *See, e.g., Mead Corp. v. Tilley,* 490 U.S. ——, 109 S.Ct. 2156, 2162–63, 104 L.Ed.2d 796 (1989) (concluding that scope of proposals to be reconciled, in light of no further explanation in conference report, limited inference that change in one word could create).

These features contribute to the clout that conference committee reports carry, when reliance on such extrinsic aids for interpretation is appropriate. *See* Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term,* 68 Iowa L.Rev. 195, 201 & n. 49 (1983). By contrast, the *sui generis* procedure crafted by Representative Edwards and Senator DeConcini to achieve a compromise bankruptcy bill cannot claim comparable status.

**1550**

compromise"); *Rosenow v. Illinois Dep't of Revenue*, 715 F.2d 277, 280 (7th Cir. 1983) ("We think it appropriate to rely upon [pre–Code] precedents, as well as upon our impression that the two Senate reports, which are consistent with each other, provide an indication of congressional intent which is both more reliable and more complete than the inexplicably differing statements of the House floor manager."). While we have not previously addressed the weight to accord the Joint Statement, our treatment of the Bankruptcy Code's legislative history thus far is consistent with our conclusion herein. *See In re Moog*, 774 F.2d 1073, 1076 (11th Cir.1985) (buttressing plain reading of statute with "the statements of . . . the sponsors of the Code"); *In re Southern States Motor Inns, Inc.*, 709 F.2d 647, 650 (11th Cir.1983) (citing "joint explanatory statement of floor managers" along with committee reports as legislative history of Code), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984); *In re Cross*, 666 F.2d 873, 882 n. 14 (5th Cir. Unit B 1982) (dicta) (Joint Statement cited, without preference, along with committee reports).

The Supreme Court likewise has treated the Joint Statement as having some, but not great, weight in expressing congressional intent. In many cases the Court has preferred the committee reports, without resort to the Joint Statement. *See, e.g., Midlantic Nat'l Bank v. New Jersey Dep't of Env. Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1983). In other cases the Joint Statement receives citation, but it is not given prominence, *e.g., United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n. 8, 103 S.Ct. 2309, 2313 n. 8, 76 L.Ed.2d 515 (1983), or it is cited to demonstrate that no facet of the legislative history sheds light on the particular question before the Court, *e.g., Ron Pair*, 489 U.S. at —— n. 6, 109 S.Ct. at 1031 n. 6; *Ohio v. Kovacs*, 469 U.S. 274, 280, 105 S.Ct. 705, 708, 83 L.Ed.2d 649

(1985). It seems particularly revealing that the Court affirmed the court of appeals opinion that had conferred the greatest weight on the Joint Statement, *In re Timbers of Inwood Forest*, 793 F.2d at 1396–1401, without a single citation to that seemingly important piece of legislative history,[9] *see United Savings Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 379–81, 108 S.Ct. 626, 634–35, 98 L.Ed.2d 740 (1988).

In *Kovacs*, the Court determined congressional intent for the meaning of the term "claim" by examining the term's development through successive House and Senate bills. The Court's comment about the Joint Statement is revealing in its understatement, labeling it "a statement by the sponsors of the Bankruptcy Reform Act" that addressed the scope of the provision, section 101(4)(B), without explaining the differences between the successive versions proposed in each house. 469 U.S. at 280, 105 S.Ct. at 708; *see also Ron Pair*, 489 U.S. at —— n. 6, 109 S.Ct. at 1031 n. 6 (calling Joint Statement "the statements by the managers of the legislation"). *Kovacs* is instructive in the instant case because we face a similar problem. Section 523(a)(7) progressed through several different drafts before emerging from the Edwards–DeConcini meeting in its present form, and the Joint Statement purports to explain its scope without an explanation for the difference in wording. The changes in the language of section 523(a)(7) and in the corresponding sections referenced therein are more probative of congressional intent than the Joint Statement.

The Senate Judiciary Committee proposal linked the dischargeability of a tax penalty to the dischargeability of the tax to which it relates. The proposal accomplished this goal by a cross-reference to the section designating taxes not subject to discharge. The Senate Finance Committee reformulated the language to precisely define this linkage as applying to tax penalties calcu-

---

**9.** The Court found, as we do here, that the plain language of the statutory provisions at issue made it questionable whether the legislative history "is at all relevant" to the task of interpreta-

tion. 484 U.S. at 380, 108 S.Ct. at 634. The short inquiry into the legislative history thereafter conducted by the Court cites to the committee reports but not the Joint Statement.

lated by reference to the amount of the tax. The Finance Committee proposal added a method for discharging liability for other kinds of tax penalties.[10] The Edwards–DeConcini compromise abandoned the more specific language for section 523(a)(7)(A) of the Finance Committee proposal in favor of more general language much like the Judiciary Committee proposal. The compromise also retained the proposed subsection (B), with some largely grammatical language changes. In the context of these several revisions, then, the final form of subsection (A) cannot be reasonably read as narrowly as the more specific language of the Finance Committee proposal, which is the reading urged in the Joint Statement. *Cf. Blessitt v. Retirement Plan*, 848 F.2d 1164, 1179 (11th Cir. 1988) (en banc) (no inference to be drawn from change in single word where context limits range of reasonable congressional intent); *Drummond Coal Co. v. Watt*, 735 F.2d 469, 474 (11th Cir.1984) (same).

Moreover, the use in subsection (A) of a "flip out" to section 523(a)(1), which subsequently flips out to section 507(a)(7), adds several layers of complexity to any analysis of the meaning of subsection (A). By virtue of the series of references, section 507(a)(7) defines the kinds of taxes not subject to discharge. Its predecessor sections underwent many changes from the Senate Judiciary Committee to the Senate Finance Committee, *see* S.Rep. No. 1106, *supra*, at 14–17, and the Joint Statement professes that the final product is a compromise between the House and Senate

versions, *see* 124 Cong.Rec. 32398, 33997. Consequently, the changing content of this section has, by incorporation, altered the scope of section 523(a)(7)(A) from draft to draft. The Joint Statement, however, interprets the subsection as if it had not changed since the Judiciary Committee draft, an unreasonable premise in light of the circumstances.

We conclude from the development of section 523(a)(7) and related sections that the present wording cannot be attributed to an accident of draftsmanship. *Cf. In re Adamo*, 619 F.2d 216, 219–22 (2d Cir.) (finding drafting error in different section of Bankruptcy Code), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980). With many interests and positions to reconcile in a complex interrelated statute we believe the congressional actions speak louder than words. *See National Wildlife Fed'n v. Marsh*, 721 F.2d 767, 776–79 (11th Cir.1983) (drawing congressional intent from change in statutory language rather than conference report), *reh'g denied*, 747 F.2d 616 (11th Cir.1984). To the extent that legislative history has relevance, we find that the better sources lend ample support to a plain meaning construction of section 523(a)(7).

### D.

We resolve the question of how to read the legislative history in a simple fashion: by reading the statute and taking it at face value. Given the several "mute intermediate legislative maneuvers"[11] through which section 523(a)(7) passed before reaching its present form, we conclude that con-

---

**10.** The phrase "transaction or event" in subsection (B) was not expressly defined in the Senate Finance Committee proposal. It does have an apparent relationship with another proposed section that did not survive the Edwards–DeConcini compromise. The proposed section 346(a) defined the date on which a tax liability is incurred for purposes of the Bankruptcy Code. In that proposal, income taxes are treated separately from all other taxes. Income taxes would be incurred on the last day of the taxable period; other taxes—such as property, estate, gift or sales taxes—would be incurred on the date of the "transaction or event" giving rise to the tax. The parallel language suggests that the Finance Committee's proposal for section 523(a)(7)(B) was directed to penalties associated with taxes of the kind described in section

346(a)(2). Such speculation is, however, pointless, given the deletion of the definitional section in the Edwards–DeConcini compromise. The Joint Statement explains that the substance of the section was incorporated into section 507(a)(7). *See* 124 Cong.Rec. 32416, 34016. Because the parallel language was not so incorporated, section 523(a)(7)(B) can not be confined in the fashion that the Finance Committee proposal might suggest.

**11.** *See Mead Corp. v. Tilley*, 490 U.S. ——, 109 S.Ct. 2156, 2162, 104 L.Ed.2d 796 (1989). While *Tilley*, and our earlier holding in *Drummond Coal*, illuminate the peril of inferring congressional intent from the unexplained change of a single word between drafts of a bill at intermediate stages, we consider our examination of the

gressional intent cannot be divined from extrinsic sources. The early committee reports do not refer to a comparably worded proposal. The Joint Statement contains inaccuracies and inconsistencies.[12] It asserts that the current language is an adoption of the Senate amendment's language, *see* 124 Cong.Rec. 34016, which it is not. Moreover, the two instances in which section 523(a)(7) is mentioned lack consistency, neglecting any reference to subsection (B) in the first instance, *see id.* at 33998, while expanding on the matter later, *see id.* at 34016. Moreover, knowing that the House originally passed a version very different from the Senate, we should not readily assume that the more general language enacted by the two houses possesses the same meaning as the more specific language proposed by the Senate Finance Committee. *Cf. Blessitt,* 848 F.2d at 1178–79 (scope of bills to be reconciled in conference suggests scope of changes that were reasonably contemplated by Congress). "Ambiguous and unclear legislative history may not be used to alter the ordinary meaning of statutory language." *Jones v. MARTA,* 681 F.2d 1376, 1380 n. 10 (11th Cir.1982). Thus, as the Supreme Court has counseled in *Dimension Financial* and other cases, in light of the compromises and changes, we can effect the will of Congress only by giving effect to the words of the statute.

## CONCLUSION

For the foregoing reasons, the decision of the district court on the issue of post-petition interest is REVERSED and the decision of the district court on the issue of tax penalties is AFFIRMED.

many changes in section 523(a)(7) appropriate. The substance of those changes is substantial and appears the more so when placed in perspective with the companion sections referenced by section 523(a)(7)(A). Also, we do not look to those changes to indicate positively what congressional intent is; we instead conclude from those changes only that the Joint Statement does not accurately represent an expression of congressional intent.

**12.** We are not the first court to discover such flaws in the Joint Statement. *See, e.g., Kelly,* 841 F.2d at 912 n. 3; *Rosenow,* 715 F.2d at 280; *see also Unsecured Creditors' Comm.,* 768 F.2d at 586 (Widener, J., concurring in the result).