In re Jimmy Randall TURNER, Debtor.

Jimmy Randall TURNER, Plaintiff,

v.

UNITED STATES of America,
INTERNAL REVENUE
SERVICE, Defendants.

Bankruptcy No. 94–02405–BGC–7.
Adv. No. 94–00198.

United States Bankruptcy Court,
N.D. Alabama,
Southern Division.

Jan. 9, 1995.

320

Richard Hughes, Birmingham, AL, for plaintiff-debtor.

Richard O'Neal, Asst. U.S. Atty., Birmingham, AL, for defendants.

Andre Toffel, Trustee.

## MEMORANDUM OPINION

BENJAMIN COHEN, Bankruptcy Judge.

This matter came before the Court for a trial on the Petition to Discharge Taxes filed by the Debtor, Jimmy Randall Turner. Mr. Richard Hughes, the attorney for the Debtor, and Mr. Richard O'Neal, Assistant United States Attorney, on behalf of the Defendants, appeared. The matter was submitted on the record in the case, and the stipulations, assertions and arguments of counsel, who advised the Court that no testimony would be offered. The Debtor contends that certain income taxes owed for the years 1986, 1987, 1988, and 1989 should be discharged by this Chapter 7 bankruptcy. The IRS disagrees.

This Court's analysis of this matter must begin with the general rule from section 523(a) of the Bankruptcy Code that income taxes which were due more than three years before a bankruptcy was filed, and which were assessed more than 240 days before the bankruptcy was filed, are discharged by that bankruptcy. A brief explanation is required. That rule is framed in section 523 in the negative and explains which taxes are *not* included in a discharge. For instance, from section 523 one learns that a debtor's discharge does not include debts for taxes of the kind described in 11 U.S.C. § 507(a)(7)(A). Moving to section 507(a)(7)(A) one learns that the taxes which may not be discharged by section 523 include income taxes which became due within three years of the date the bankruptcy was filed, income taxes which were assessed within 240 days of the date the bankruptcy was filed, and income taxes which were not assessed before the bankruptcy was filed but which were still assessable after the bankruptcy was filed. In other words, taxes which fall within the three exceptions listed in section 507(a)(7)(A) are not discharged by way of section 523 and are available for collection by the IRS.[1]

## I. FACTS

The Debtor owes income taxes, as well as related interest and penalties, for the years 1986, 1987, 1988, and 1989. Tax returns for the years in question became due on April 15, 1987, April 15, 1988, April 15, 1989, and April 15, 1990, and were timely filed. On January 5, 1988, the Debtor filed a case under Chapter 7 of the Bankruptcy Code. The case remained open for 92 days and was closed on April 5, 1988. The Debtor filed a Chapter 13 case on March 28, 1990, which remained pending for 965 days and was dismissed on November 16, 1992. The Debtor filed another Chapter 13 case on November 20, 1992, which remained pending for 181 days and was dismissed on May 19, 1993. The petition in this case was filed on April 25, 1994.

The taxes owed by the Debtor for the year 1986 were assessed by the IRS on June 1, 1987. The 1987 taxes were assessed on May 16, 1988. The 1988 taxes were assessed on June 5, 1989. The 1989 taxes were assessed on May 28, 1990.

All of the taxes were in the amount shown on the Debtor's tax returns as being owed. The taxes were not paid because the Debtor simply did not have the money to pay the

---

1. 11 U.S.C. § 523 reads in part:
 (a) A discharge under section[s] 727, 1141, 1228(a) 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
 (1) for a tax or a customs duty—
 (A) of the kind and for the periods specified in section 507(a)(2) or [section] 507(a)(7) of this title, whether or not a claim for such tax was filed or allowed;
 (B) with respect to which a return, if required—
 (i) was not filed; or
 (ii) was filed after the date of which such return was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition; or
 (C) with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;
 (7) to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty—
 (A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or

 (B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition;
 11 U.S.C. § 507 reads in part:
 (a) The following expenses and claims have priority in the following order:
 (7) Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for—
 (A) a tax on or measured by income or gross receipts—
 (i) for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition;
 (ii) assessed within 240 days, plus any time plus 30 days during which an offer in compromise with respect to such tax that was made within 240 days after such assessment was pending, before the date of the filing of the petition; or
 (iii) other than a tax of a kind specified in section 523(a)(1)(B) or 523(a)(1)(C) of this title, not assessed before, but assessable, under applicable law or by agreement, after, the commencement of the case;

taxes when they became due. For the year 1986, taxes were assessed for $2,566.00, for the year 1987 in the amount of $2,883.00, for the year 1988 in the amount of $3,710.00, and for the year 1989 in the amount of $4,266.00. The total taxes assessed for the years 1986 through 1989 was $13,425.00.

Penalties for late payment have been assessed against the Debtor by the IRS in the amount of $536.41 for 1986 taxes, in the amount of $659.72 for 1987 taxes, in the amount of $960.67 for 1988 taxes, and in the amount of $748.05 for 1989 taxes. Total penalties in the amount of $2,904.85 have been assessed by the IRS against the Debtor in relation to the 1986 through 1989 taxes.

As of the date the petition in this case was filed, interest had accrued on the taxes owed by the Debtor, and had been assessed by the IRS, in the amount of $1,129.61 for 1986 taxes, in the amount of $1,471.84 for the 1987 taxes, in the amount of $2,259.32 for the 1988 taxes, and in the amount of $1,940.47 for the 1989 taxes. Total interest has accrued on the 1986 through 1989 taxes, and been assessed by the IRS, in the amount of $6,804.24.

Taxes, interest and penalties in the amount of approximately $23,134.09 were assessed against the Debtor before the filing of the petition in this case. Between April 15, 1987, and April 25, 1994, the Debtor paid the IRS a total of approximately $7,969.58. The balance of the debt due by the Debtor to the IRS is $15,483.02, which total consists of: for 1986, taxes = $0, interest = $684.97, and penalties = $2.72; for 1987, taxes = $0, interest = $1,480.94, and penalties = $40.24; for 1988, taxes = $3,099.64, interest = $2,259.32, and penalties = $960.67; and for 1989, taxes = $4,266.00, interest = $1,940.47, and penalties = $748.05.

Despite the fact that the Debtor has paid almost $8,000 to the IRS, he still owes the IRS over $2,000 more than the combined, total taxes for all four years in question. And of the $15,483 owed by the Debtor to the IRS, less than one half ($7,365.64) represents actual unpaid taxes. The major portion of the debt represents accrued interest ($6,365.70) and penalties ($1,751.68).

## II. CONTENTIONS

The Debtor contends that because the tax returns for the taxes in question were due more than three years prior to the filing of the petition in this case, and because the taxes were assessed more than 240 days before bankruptcy, the taxes, including related interest and penalties, are dischargeable. The IRS contends that, by virtue of 11 U.S.C. § 108(c) and 26 U.S.C. § 6503(h), the section 507(a)(7)(A)(i) three year priority period and the section 507(a)(7)(A)(ii) 240 day period and the 523(a)(7)(B) three year dischargeability period were all suspended during the time that the Debtor was in his three prior bankruptcy cases.

## III. ISSUES

The issues before this Court are (a) whether the three year priority period of section 507(a)(7)(A)(i) was suspended during the time the Debtor was in his prior bankruptcy cases; (b) whether the 240 day priority period of section 507(a)(7)(A)(ii) was suspended during the time the Debtor was in his prior bankruptcy cases; and, (c) whether the three year dischargeability period of section 523(a)(7)(B) was suspended during the time the Debtor was in his prior bankruptcy cases.[2] These issues have common statutory and equitable components.

2. The unlimited permutations of factual situations which would exist if this Court speculates in "what if's" is mind boggling. The analysis in this memorandum opinion and the order entered contemporaneously with it are based *only* on the facts of this case. Pursuant to section 523(a)(1) of the Bankruptcy Code, a discharge in bankruptcy does not release a debtor from liability for the following taxes: (a) taxes entitled to priority under section 507(a)(2) or [section] 507(a)(7); (b) taxes for which a required tax return was not filed; (c) taxes for which a tardy tax return was filed within two years of the bankruptcy filing;

(d) taxes for which a fraudulent tax return was filed; and, (e) taxes which the debtor otherwise willfully attempted to evade or defeat. Section 507(a)(7)(A) provides, in relevant part, that the following income taxes are entitled to priority: (i) income taxes for a year for which a tax return was due less than three years before the bankruptcy filing; (ii) income taxes assessed within 240 days of bankruptcy; or (iii) income taxes not assessed before but assessable after the bankruptcy filing. Section 523(a)(7) makes nondischargeable debts for certain penalties payable to gov-

## IV. STATUTORY TIME SUSPENSION

### A. Taxes and Plain Language

■ The IRS contends that the three year priority period of section 507(a)(7)(A)(i), and the 240 day priority period of section 507(a)(7)(A)(ii), and the three year dischargeability period of section 523(a)(7)(B) are suspended by operation of 11 U.S.C. § 108(c) and 26 U.S.C. § 6503(h). Because those statutes explicitly state that they apply only to *nonbankruptcy law*, this Court disagrees with the IRS.[3] Section 507(a)(7)(A)(i) and (ii), and section 523(a)(7)(B) are bankruptcy laws. Sections 108(c) and 6503(h) do not apply to *bankruptcy laws. In re Quenzer*, 19 F.3d 163 (5th Cir.1993); *In re Eysenbach*, 170 B.R. 57 (Bankr.W.D.N.Y.1994). That plain language interpretation of those sections should be sufficient to decide the issues in this case; however, because so much has been written on these issues which disagrees with this Court's position, further explanation is mandatory. The analysis of the plain language of the statutes has both a bankruptcy law and a nonbankruptcy law component.

### (1) Bankruptcy Law Perspective

From the *bankruptcy law perspective*, the Court of Appeals for the Eleventh Circuit addressed a similar tax, time period, issue and found that the plain language of the statute controlled. In *In re Burns*, 887 F.2d 1541, 1544 (11th Cir.1989) the debtor contended that the plain language of section 523(a)(7)(B) required discharge of tax penalties imposed with respect to otherwise nondischargeable income taxes that were more than three years old. "Since her tax returns for 1977 through 1979 are transactions or events occurring more than three years prior to her 1984 Chapter 7 filing, Burns reasoned that the penalties associated therewith are discharged." *Id.* at 1542. The court of appeals agreed with the debtor, based on the plain language of the statute, and rejected the IRS's contention that legislative history dictated that tax penalties be treated the same as the related tax obligations. In that regard, the Court stated:

Pre–Code law was silent on the dischargeability of liability for tax penalties. Courts generally took the position that the penalties survived a discharge in bankruptcy, resting either on the theory that the penalties constituted a nonprovable debt or on the theory that the penalties were to be treated in all respects as taxes because they were assessed and collected in the same manner as taxes. The second of these theories linked the dischargeability of the penalty with the underlying tax liability. The IRS pursued tax penalties in accord with the second theory during the ten years immediately preceding enactment of the Bankruptcy Code. The Commission on Bankruptcy Laws had the intention of clarifying and rationalizing the dischargeability status of various penalties,

---

ernmental units *except* tax penalties relating to dischargeable taxes or "imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition." 11 U.S.C. § 523(a)(7)(B). Subsection (iii) of Section 507(a)(7)(A) is not at issue since the taxes were assessed before bankruptcy.

3. 11 U.S.C. § 108 reads in part:
 (c) Except as provided in section 524 of this title, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor, or against an individual with respect to which such individual is protected under section 1201 or 1301 of this title, and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of—

(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) 30 days after notice of the termination or expiration of the stay under section 362, 922, 1201, or 1301 of this title, as the case may be, with respect to such claim.
26 U.S.C. § 6503 reads in part:
(h) Cases under title 11 of the United States Code.—The running of the period of limitations provided in section 6501 or 6502 on the making of assessments or collection shall, in a case under title 11 of the United States Code, be suspended for the period during which the Secretary is prohibited by reason of such case from making the assessment or from collecting and—
(1) for assessment, 60 days thereafter, and
(2) for collection, 6 months thereafter.

including tax penalties, when it proposed a predecessor to section 523(a)(7) of the Bankruptcy Code.

Section 523(a)(7), then, innovates on the matter of tax penalties. . . . While the language of this subsection frames nondischargeable tax penalties as an exception to an exception to an exception, once the triple negative is taken into account the meaning of the provision gains clarity. A tax penalty is discharged if the tax to which it relates is discharged (in the precise terms of the statute, not nondischargeable) or if the transaction or event giving rise to the penalty occurred more than three years prior to the filing of the bankruptcy petition. Since the statute uses the disjunctive, a tax penalty that does not qualify for discharge under one of the two aforementioned circumstances may still qualify under the other.

Because the Bankruptcy Code introduced a sweeping overhaul to a substantial part of the system, "it is not appropriate or realistic to expect Congress to have explained with particularity each step it took. Rather, as long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." [*U.S. v.*] *Ron Pair* [*Enterprises, Inc.*], 489 U.S. [235] at 240–41, 109 S.Ct. at [1026], 1030 [103 L.Ed.2d 290]. We must therefore look to the language of section 523(a)(7) itself, and where, as here, that language is plain, we must enforce it according to its terms. Those terms provide that Burns' tax penalties were not exempt from the discharge entered in her Chapter 7 case.

887 F.2d at 1543–44.

The circuit court's dogged refusal in *Burns* to embellish or modify the meaning and scope of the plain language of the statute governing the dischargeability of tax penalties leads to the conclusion that the statutes relied on here by the IRS do not operate to toll the time periods specified in sections 507(a)(7)(A)(i) and (ii) and 523(a)(7)(B) during the pendency of the Debtor's previous bankruptcy cases. *Accord, In re Quenzer,* 19 F.3d 163 (5th Cir.1993); *In re Eysenbach,* 170 B.R. 57 (Bankr.W.D.N.Y.1994).

(2) Nonbankruptcy Law Perspective

From the *nonbankruptcy law perspective,* 11 U.S.C. § 108(c) provides that if someone is precluded by bankruptcy from filing suit in a nonbankruptcy forum against a debtor within the time fixed by "applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement," then the period for filing the suit does not expire until the later of the end of such period, "including any suspension of the period occurring on or after the commencement of the [bankruptcy] case," or 30 days after notice of the termination of the automatic stay (Parenthetical added).

Section 6503(h) of the Internal Revenue Code is one of those nonbankruptcy laws and it provides that the "running" of the periods of limitation contained in the nonbankruptcy sections 6501 and 6502 of the Internal Revenue Code, which relate to the assessment of taxes and the collection of taxes after assessment, is "suspended" for the period during which the IRS is prohibited by reason of a case under title 11 from making the assessment or from collecting, and for an additional 60 day period after the bankruptcy case for assessment, and for an additional 6 months after the bankruptcy case for collection.

■ Yes, the automatic stay of the Bankruptcy Code suspends the time limits for the assessment and collection of taxes, but the automatic stay has no effect on the definitional component of the Bankruptcy Code which specifies which taxes are not discharged. Neither section 108(c) of the Bankruptcy Code nor section 6503(h) of the Internal Revenue Code mention the word "discharge," or refer to section 523 or section 507, or by their express terms purport to relate to or effect either the dischargeability or priority of taxes in bankruptcy, but instead, specifically apply to nonbankruptcy periods of limitation. Sections 507(a)(7)(A) and 523(a)(7)(B) indisputably do not fall into the category of "applicable nonbankruptcy law." The Congressional reports contain no language which purports to relate section 108(c) or I.R.C. section 6503(h) to either section 523 or section 507, or indicate that Congress specifically intended that one bankruptcy case should have an effect on the

priority or dischargeability of taxes in a subsequent bankruptcy case. On the other hand, a considerable number of courts have, in reliance upon general policy considerations extended the "tolling" provisions of sections 108(c) and 6503(h) to the time periods specified under section 507(a)(7)(A).[4]

■ In disagreement with the courts that have linked the bankruptcy discharge with the IRS statutes of limitations, this Court aligns itself with its circuit court's directive in *In re Burns* to accept the plain language of a statutes and concludes that neither section 523(a)(7)(B) nor [section] 507(a)(7)(A)(i) contains language which suggests that the time periods specified therein should be tolled, suspended, postponed, delayed, interrupted, extended, enlarged, increased, augmented or expanded in any manner, or for any reason or purpose; and that, the section 507(a)(7)(A)(ii) 240 period specifically may only be suspended while an offer in compromise is pending; and that, neither 11 U.S.C. § 108(c) nor 26 U.S.C. § 6503(h) mentions either the word "discharge" or "priority," or refers to either section 523 or [section] 507, or by its express terms purports to relate to or effect either the dischargeability of taxes and tax penalties in bankruptcy or the priority of taxes and tax penalties in bankruptcy; and that, both 11 U.S.C. § 108(c) and 26 U.S.C. § 6503(h) specifically apply to non-bankruptcy periods of limitation and neither section 523(a)(7)(B) nor section 507(a)(7)(A) can properly be described as "applicable non-bankruptcy law."

The Fifth Circuit Court of Appeals agrees with these conclusions. Notwithstanding certain general policy considerations and the many courts that have held that the time periods of section 507(a)(7)(A)(i) and (ii) are "suspended" during a bankruptcy, the Fifth Circuit Court of Appeals in *In re Quenzer*, 19 F.3d 163 (5th Cir.1993) recently stated:

> In the district court the government successfully relied on the suspension provision in section 108(c) of the Bankruptcy Code as the basis for tolling the priority period for the collection of taxes during the prior bankruptcy proceedings. Under the plain language of section 108(c), however, that suspension applies only to nonbankruptcy law and nonbankruptcy proceedings. Absent some other basis for tolling the section 507 time limit, the Quenzers' tax liability for the years 1984 and 1985 must be discharged.

19 F.3d at 165. In *Quenzer*, the Fifth Circuit reversed the district and bankruptcy court, and held that 1984 and 1985 income taxes were dischargeable under 11 U.S.C. § 507(a)(7)(A) in a Chapter 7 case filed in March 1990, even though the debtors had previously been in a Chapter 13 case from September 1986 until March 1988.

The Bankruptcy Court for the Western District of New York also agrees. *In re Eysenbach*, 170 B.R. 57 (Bankr.W.D.N.Y. 1994) involved a Chapter 13 case filed on July 9, 1993 in which an unsecured creditor challenged the priority given in the plan to IRS claims for 1988 and 1989 income taxes. The IRS contended that the time limits specified in section 507(a)(7)(A) were tolled pursuant to 11 U.S.C. § 108(c) and 26 U.S.C. § 6503(b) and (h) during the time that the debtor had been involved in a previous Chapter 13 case, from December 28, 1990, until May 19, 1993. The bankruptcy court held that the taxes were not entitled to be paid as a priority claim, on the basis that the plain language of the statutes relied upon by the IRS did not support the IRS's "tolling" argument. The court stated:

4. *See, e.g., In re West*, 5 F.3d 423 (9th Cir.1993); *In re Montoya*, 965 F.2d 554 (7th Cir.1992); *In re Molina*, 99 B.R. 792 (S.D.Ohio 1988); *In re Linder*, 139 B.R. 950 (D.Colo.1992); *In re Deitz*, 116 B.R. 792 (D.Colo.1990); *In re Brickley*, 70 B.R. 113 (9th Cir. BAP 1986); *In re Harris*, 167 B.R. 680 (Bankr.M.D.Fla.1994); *In re Reed*, 165 B.R. 959 (Bankr.N.D.Ga.1993); *In re Teeslink*, 165 B.R. 708 (Bankr.S.D.Ga.1994); *In re Sirman*, 1994 WL 374432 (Bankr.M.D.Fla.1994); *In re Smith*, 165 B.R. 398 (Bankr.M.D.Pa.1993); *In re Grogan*, 158 B.R. 197 (Bankr.E.D.Cal.1993); *In re Bowling*, 147 B.R. 383 (Bankr.E.D.Va.1992); *In re Stoll*, 132 B.R. 782 (Bankr.N.D.Ga.1990); *In re Ross*, 130 B.R. 312 (Bankr.D.Neb.1991); *In re Ringdahl*, Bankr.L.Rep.P 74,082, 1991 WL 284105 (Bankr.M.D.Fla.1991); *In re Wise*, 127 B.R. 20 (Bankr.E.D.Ark.1991); *In re Bryant*, 120 B.R. 983 (Bankr.E.D.Ark.1990); *In re Davidson*, 120 B.R. 777 (Bankr.D.N.J.1990); *In re Florence*, 115 B.R. 109 (Bankr.S.D.Ohio 1990); *In re Ryan*, 1989 WL 155684 (Bankr.D.Colo.1989); *In re Quinlan*, 107 B.R. 300 (Bankr.D.Colo.1989); *In re Carter*, 74 B.R. 613 (Bankr.E.D.Pa.1987).

This Court rejects the notion that section 108(c) of the Bankruptcy Code, when read in conjunction with section 6503 of the Internal Revenue Code, demonstrates an intent to toll the three year priority period of 11 U.S.C. § 507(a)(7)(A)(i). Although section 108(c) provides generally for an extension of time to commence or continue a civil action, its application is expressly limited to those time periods that are established by "applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement." As a provision of the Bankruptcy Code, section 507 is obviously not subject to the tolling powers of section 108(c). Subdivisions b and h of 26 U.S.C. § 6503 provide that the pendency of a bankruptcy proceeding may operate to extend the periods of limitations established under sections 6501 and 6502 of the Internal Revenue Code with respect to collection activity outside of bankruptcy. However, neither of these sections is implicated in the present motion. In short, the referenced statutory provisions in 11 U.S.C. § 108 and 26 U.S.C. § 6503 simply do not deal with the time limits set forth in section 507(a)(7) of the Bankruptcy Code. 170 B.R. at 59.

In the instant case, the IRS contends that if the period that the IRS is precluded from assessing or collecting a tax by the automatic stay in a previous case is included in the time periods specified in sections 507(a)(7)(A)(i) and (ii), and 523(a)(7)(B), then the IRS will not be allowed the period of time that Congress intended for the collection and assessment of taxes, and debtors could, by filing successive cases, substantially minimize the collection period. As a first impression, the unambiguous language of the statutes involved is the clearest indicator of the intent of Congress. "[W]e can effect the will of Congress only by giving effect to the words of the statute." *In re Burns,* 887 F.2d at 1552. But regardless of the fact that the language of the relevant statutes is unambiguous, this Court, like the court of appeals in *Burns,* 887 F.2d at 1544–1552, has performed an "even if the plain language of the statute was ambiguous" analysis, and found no language in the legislative history which relates either section 108(c) or section 6503(h) to either section 523(a)(7)(B) or section 507(a)(7)(A), or vice versa, or relates the nonbankruptcy statutes to the dischargeability of taxes and tax penalties, or to the priority of taxes and tax penalties. Neither is there any language in the legislative history of either section 523(a)(7)(B) or section 507(a)(7)(A) which suggests that the respective time periods contained in those statutes should be tolled or suspended for any reason, other than, of course, the reason specifically provided for in section 507(a)(7)(A)(ii). More importantly, had Congress intended, in the case of successive bankruptcy filings, for the time periods specified in sections 507(a)(7)(A) and 523(a)(7)(B) to be suspended during the pendency of preceding bankruptcy cases, it could have easily made that intention clear. "Had Congress wished specifically to set tolling limitations with respect to section 507(a)(7), it could have inserted an appropriate statutory provision into the Bankruptcy Code." *In re Eysenbach,* 170 B.R. at 59. That is exactly what was done in section 507(a)(7)(A)(ii) in relation to offers in compromise. Conspicuous in its absence is any Congressional action in relation to section 507(a)(7)(A)(i).

Section 507(a)(7)(A)(ii) specifically provides that the 240 day period contained therein is suspended while an offer in compromise is pending. Treasury Regulation § 301.7122–1(f) provides that nonbankruptcy limitation periods for assessment and collection of taxes after assessment are also suspended while offers in compromise are pending. Had Congress intended, in the case of successive bankruptcy filings, for the time periods specified in sections 507(a)(7)(A)(i) and 523(a)(7)(B) to be suspended during the pendency of preceding bankruptcy cases, it could have easily made that intention clear, the same way it made the nonbankruptcy tolling provision relating to offers in compromise found in Treas.Reg. § 301.7122–1(f) applicable to the 507(a)(7)(A)(ii) time period.

The legislative history of section 507(a)(7)(A) clearly supports the argument that Congress was fully aware of the I.R.C. nonbankruptcy tolling provisions, not just the one contained in 6503(h), and drafted 507(a)(7)(A)(ii) and (iii) so as to, *under limit-*

*ed circumstances,* preserve for the IRS a priority in distribution, and a minimum period of collection, in the event assessment is delayed because of I.R.C. nonbankruptcy tolling provisions, and the three year period in [section] 507(a)(7)(A)(i) is thereby effectively reduced:

Sixth priority. The House amendment modifies the provisions of both the House bill and Senate amendment in the case of sixth priority taxes. Under the amendment, the following Federal, State and local taxes are included in the sixth priority:

First. Income and gross receipts taxes incurred before the date of the petition for which the last due date of the return, including all extensions of time granted to file the return, occurred within 3 years before the date on which the petition was filed, or after the petition date. Under this rule, the due date of the return, rather than the date on which the taxes were assessed, determines the priority.

Second. Income and gross receipts taxes assessed at any time within 240 days before the petition date. Under this rule, the date on which the governmental unit assesses the tax, rather than the due date of the return, determines the priority.

If, following assessment of a tax, the debtor submits an offer in compromise to the governmental unit, the House amendment provides that the 240–day period is to be suspended for the duration of the offer and will resume running after the offer is withdrawn or rejected by the governmental unit, but the tax liability will receive priority if the title 11 petition is filed during the balance of the 240–day period or during a minimum of 30 days after the offer is withdrawn or rejected. This rule modifies a provision of the Senate amendment dealing specifically with offers in compromise. Under the modified rule, if after the assessment, an offer in compromise is submitted by the debtor and is still pending (without having been accepted or rejected) at the date on which a title 11 petition is filed, the underlying liability will receive sixth priority. Howeverer, *if an assessment of a tax liability is made but the tax is not collected within 240 days, the tax will not receive priority under section 507(a)(6)(A)(i) and the debtor cannot revive a priority for the tax by submitting an offer in compromise.*

Third. Income and gross receipts taxes not assessed before the petition date but still permitted, under otherwise applicable tax laws, to be assessed. Thus, for example, a prepetition tax liability is to receive sixth priority under this rule if, under the applicable statute of limitations, the tax liability can still be assessed by the tax authority. *This rule also covers situations referred to in section 507(a)(6)(B)(ii) of the Senate amendment where the assessment or collection of a tax was prohibited before the petition pending exhaustion of judicial or administrative remedies,* except that the House amendment eliminates the 300–day limitation of the Senate bill. So, for example, if before the petition a debtor was engaged in litigation in the Tax Court, during which the Internal Revenue Code bars the Internal Revenue Service from assessing or collecting the tax, and if the tax court decision is made in favor of the Service before the petition under title 11 is filed, thereby lifting the restrictions on assessment and collection, the tax liability will receive sixth priority even if the tax authority does not make an assessment within 300 days before the petition (provided, of course, that the statute of limitations on assessment has not expired by the petition date).

H.R.Rep. No. 95–595, 95th Congress, 1st Session 1188–1190 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6495–6496; S.Rep. No. 95–989, 95th Cong., 2nd Sess. 158–159 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5856–5857 (Emphasis added). The most salient point to be gained from the passage quoted is that Congress knew of the nonbankruptcy tolling provisions, and the procedures, circumstances and events specified under the I.R.C. which are part of the tax collection process and which impede and delay the IRS's assessment and collection of taxes, and despite that knowledge, elected to provide the IRS with only a very narrow opportunity for the collection of taxes, which opportunity includes the extension of only one of the bankruptcy priority-discharge time periods,

that is 507(a)(7)(A)(ii), and even then, this one subsection is effected in only one circumstance, that is during the pendency of an offer in compromise.

### (3) Statutes of Limitations As Substance or Procedure

█ Sections 507 and 523 are substantive sections. They define what taxes are to be included in a bankruptcy discharge and which taxes are to be excluded. Sections 108 and 6503 are procedural. They establish the statutes of limitations on the IRS's rights of assessment and collection of taxes. By definition a statute of limitation sets "maximum time periods during which certain actions can be brought or rights enforced. After the time period set out in the applicable statute of limitations has run, no legal action can be brought regardless of whether any cause of action ever existed." Blacks Law Dictionary 927, (6th ed. 1990). If that time period is in existence during a bankruptcy period, and relates to nonbankruptcy law as does section 6503, the time period is suspended by operation of section 108 of the Bankruptcy Code, until the bankruptcy case ends. For example, if a debtor is accused of fraud and a creditor wants to sue that debtor, in Alabama that suit must be brought within two years of the fraud. If the creditor is prohibited from suing the debtor because a bankruptcy is pending, the statute of limitations is suspended during the bankruptcy by operation of section 108(c); however, neither section 108 or the applicable statute of limitation, in this example Code of Alabama 1975, § 6–2–3, affects the substantive definition of fraud as that action is defined by section 523 of the Bankruptcy Code.

█ Actions defined by time references, such as taxes due within three years of bankruptcy, similarly cannot be affected. Yes, the taxes of sections 507 and 523 are defined in terms of "time," and yes, the statute of limitations of sections 108 and 6503 are coincidentally themselves "time" entities, *but the substantive definition of which taxes are or are not included in a bankruptcy discharge, can not be changed by a procedural statute of limitations.* To hold otherwise would allow any statute of limitations which applied to a given action, to decide the substance rather than procedure of that action. This result would be problematic. Is the character of wages which are third priority in section 507, as defined as those within 90 days of bankruptcy, changed because of an applicable statute of limitations on the collection of that debt by a creditor from a debtor? Is the character of claims for contributions to benefit plans which are fourth priority in section 507, as defined as those for services within 180 days of bankruptcy, changed because of an applicable statute of limitations on the collection of that debt by a creditor from a debtor? If they are not then would the character of taxes which are seventh priority in section 507, as defined as those within three years of bankruptcy, be changed because of an applicable statute of limitations on the collection of that debt by the IRS? All *time periods* are not suspended just because they are *time periods.* These time periods are suspended by operation of section 108 because they are statutes of limitations. Taxes are neither time periods nor statutes of limitations.

### (4) Other Suspension Provisions

Section 6503 suspends the time limitations for tax assessment during many of the preliminary stages that are prerequisite to assessment, as well as the limitation period for the collection of taxes after assessment, for reasons other than the fact that the taxpayer may have been a debtor in a bankruptcy case. For example, the limitation period for assessment is suspended for a period of 90 days upon the mailing of a notice of proposed deficiency. If the taxpayer institutes a proceeding in the Tax Court, then the limitations period is suspended further until 60 days following the date the decision of the Tax Court becomes final. 26 U.S.C. § 6503(a)(1). The limitations period for the collection of taxes after assessment is suspended (a) during the time that the assets of the taxpayer are in the control or custody of any court, not just the bankruptcy court, and for an additional 6 months following that time period, 26 U.S.C. § 6503(b); (b) during the time that the taxpayer is outside of the United States for a continuous period of 6 months, and for 6 months following the taxpayers return, 26

U.S.C. § 6503(c); and, (c) for a period equal to the period from the date property is wrongfully seized by the IRS from a third party and the date the property is returned, or a judgement directing return of the property becomes final, plus 30 days. 26 U.S.C. § 6503(f).

Other provisions of the I.R.C., and regulations promulgated by the IRS in relation thereto, specify circumstances which suspend the tax assessment and collection limitation periods. Beginning 6 months following the service of a third party summons, 26 U.S.C. § 7609(e) suspends the time for assessment during a period when a proceeding relating to the enforcement of the summons is pending, where the taxpayer brings an action to quash the summons. Both the assessment and collection limitation periods can be voluntarily waived by the taxpayer. 26 U.S.C. §§ 6501(c)(4) and 6502(a). Both periods are suspended when the taxpayer files an application for a Taxpayer Assistance Order, and do not resume until the IRS's Taxpayer Ombudsman makes a decision on the taxpayer's application. 26 U.S.C. § 7811(d). Both periods are suspended while a taxpayer's offer in compromise is pending. Treas.Reg. § 301.7122–1(f).

All suspension provisions are designed and intended to avoid prejudice to the IRS's ability to collect during periods of time in which collection or assessment is prohibited by law, or made difficult by acts of the debtor or external influences, or time periods during which collection or assessment might hinder the resolution of disputes or hinder the compromise of the tax liability by mutual assent of the IRS and the taxpayer. Does the IRS contend that any event which by virtue of any provision of the I.R.C. which suspends nonbankruptcy statutes of limitations also, suspends the time periods specified in 11 U.S.C. §§ 507(a)(7)(A) and 523(a)(7)(B)? If the IRS does not so contend, then why should one provision of section 6503 operate to suspend the bankruptcy dischargeability time periods, while other provisions of the same statute, and other provisions of the I.R.C. which also act to suspend the nonbankruptcy limitation periods for the assessment and collection of taxes not suspend the time periods of sections 507(a)(7)(A) and 523(a)(7)(B)? Again, if the IRS does not so contend, then why would Congress specifically incorporate one non-bankruptcy tolling provision (Treas.Reg. § 301.7122–1(f)) into [section] 507(a)(7)(A)(ii) but not make it applicable to [sections] 507(a)(7)(A)(i) and 523(a)(7)(B), or specifically incorporate all nonbankruptcy tolling provisions into [sections] 507(a)(7)(A) and 523(a)(7)(B)?

### B. Penalties and Plain Language

The decision in *In re Burns* is doubly potent on the point involved herein as to tax penalties. In *Burns*, the circuit court specifically determined that Congress intended, in section 523(a)(7), to treat tax penalties less generously than it had income taxes in sections 523(a)(1) and 507(a)(7). Section 523(a)(7)(B) was intended to change precode case law, which classified a tax penalty as nondischargeable if it related to a nondischargeable tax. "Section 523(a)(7), then, innovates on the matter of tax penalties." *In re Burns*, 887 F.2d at 1544. Had Congress intended tax penalties to be treated the same as taxes, then a slight modification of section 523(a)(1) would have rendered section 523(a)(7)(B) unnecessary.

Section 523(a)(7)(B) is not the only provision in the Bankruptcy Code in which tax penalties are treated less favorably than taxes. For instance, pursuant to 11 U.S.C. § 510(c)(1), a tax penalty claim may be subordinated to the claims of other unsecured creditors. *See, e.g., In re Virtual Network Services Corp.*, 902 F.2d 1246, 1250 (7th Cir. 1990). Also, under 11 U.S.C. § 726(a)(4), the payment of penalties, including tax penalties, is subordinated to the payment of all other types of claims in a Chapter 7 distribution. The plain language of section 523(a)(7)(B), therefore, leads, in this case, to a result which is consistent with the treatment accorded tax penalties in other parts of the bankruptcy code.

### C. Assumptions in Support of the IRS

Numerous assumptions are essential to the validity of the IRS's argument that the [sections] 507(a)(7)(A) and 523(a)(7)(B) dischargeability time periods *should* be sus-

pended while a debtor is in bankruptcy. The basic assumption is that the Debtor's previous bankruptcy cases actually hindered the IRS's collection efforts. The IRS's argument also assumes that the Debtor's previous bankruptcy cases prevented collection of the taxes from the Debtor's unencumbered, nonexempt property. The argument assumes further that the Debtor has unencumbered, nonexempt property that can be sold to satisfy, in whole or part, the IRS debt, or at least had nonexempt, unencumbered property at some point subsequent to the assessment of the taxes. The argument assumes that the IRS did not have ample time and opportunity to collect the taxes from the Debtor's unencumbered, nonexempt assets during the time that the Debtor was not in bankruptcy. The argument assumes that the IRS would have collected more from the Debtor during the time that the Debtor was in bankruptcy had the Debtor not been in bankruptcy during that same time period. The argument assumes that the IRS is powerless to protect its rights, or to avoid the erosion of its position, in a Chapter 13 case. Finally, the argument assumes that the IRS is incapable, because of the magnitude of the task and the complexity of its structure, of collecting taxes in a timely manner, without the extension of the section 507(a)(7)(A) and section 523(a)(7)(B) time periods.

Given these assumptions the IRS may want to offer evidence to support their arguments, either as general propositions or as they may relate to the specific circumstances of this case. This Court is not however, at liberty to assume anything more than the statutes require, especially when nothing less than the Debtor's fresh start is at stake, the language of the relevant statutes is clear, and when the entire body of rights and remedies available to aid the IRS in the collection of taxes both under the Bankruptcy Code and the Internal Revenue Code is considered.

### D. Impact on the IRS and Other General Policy Considerations

■ The Bankruptcy Code contains ample safeguards against the risk of debtors' avoiding the tax collection process by way of successive bankruptcy filings. After all, to what extent does bankruptcy actually avoid or even substantially delay the tax collection process? Relief from the automatic stay may be requested in any case, and should ordinarily be granted in Chapter 7 cases to allow the IRS to collect nondischargeable taxes outside of bankruptcy.[5] The vast majority of Chapter 7 cases last only a few months and a Chapter 7 discharge may only be obtained once every 6 years. The potential for delay of the tax collection process from Chapter 7 bankruptcies is therefore relatively minor.

Similarly a Chapter 13 case does not delay collection and because it is a vehicle for the payment of taxes, not the avoidance of taxes, and is equipped with ample safeguards to prevent abuse and delay, it may even expedite collection. The IRS's collection efforts in Chapter 13 are not then thwarted, but only modified. The bankruptcy court in *Eysenbach* explained:

Bankruptcy is not a one way street designed solely to benefit debtors to the detriment of creditors. By reason of their filing, debtors commit to fulfill certain obligations. Creditors, including tax claimants like the Internal Revenue Service, acquire rights that would be difficult to attain outside of bankruptcy. For example, a Chapter 13 debtor must disclose detailed financial information, including the identification of assets and all sources of income. Debtors voluntarily dedicate their earnings to payment of debts and may subject their income to wage deduction orders. Inherent in a Chapter 13 plan is the commitment to satisfy tax claims in full without forcing the Internal Revenue Service to expend resources on its usual enforcement

---

**5.** Since tax assessment is basically a ministerial act, whereby the IRS determines how much the debtor owes, and makes an official notation of the amount owed, there is ordinarily little reason not to allow the IRS to go forward with the tax assessment, except to the extent the assessment will create a federal tax lien on property necessary to an effective reorganization or property available for distribution to creditors. In cases filed after October 22, 1994, tax assessments are not prevented by the automatic stay. 11 U.S.C. § 362(b)(9)(D), added by the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 116, 108 Stat. 4106, 4119 (1994). Does 26 U.S.C. § 6503(h) any longer have utility with respect to the time limits for federal tax assessments?

options. But the filing of a Chapter 13 petition does not eliminate the need for creditor diligence. Although creditors must surely modify the focus of their collection activity when a bankruptcy petition is filed, bankruptcy will never excuse the termination of creditor involvement. Collection activity must change, not end. After the bankruptcy filing, creditors enjoy easy access to information regarding plan compliance. In the event that it fails to receive distributions as contemplated in the plan, a creditor may exercise a number of options, ranging from consultation with the trustee to the initiation of a motion to convert.

To the extent that Congress enacted 11 U.S.C. § 507(a)(7) to preserve for the Internal Revenue Service certain minimal periods of time for collection activity prior to discharge, the intervention of a prior bankruptcy does not necessarily violate that intention. In the present case, the Internal Revenue Service could easily have exercised those rights which the Bankruptcy Code allows it to exercise during the pendency of Chapter 13. In particular, it might have sought conversion, thereby fully preserving the nondischargeable character of its claim. While one may also speculate that the Congressional intent was more broadly based, this is hardly one of those "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982); *United States v. Ron Pair Enterprises,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989).

170 B.R. at 59–60. The court added:

This Court disagrees, therefore, with the recent decision of the Ninth Circuit in *In re West,* 5 F.3d 423 (1993), cert. denied, —— U.S. ——, 114 S.Ct. 1830, 128 L.Ed.2d 459 (1994), which concluded that a "literal interpretation of s 108(c) would frustrate the Bankruptcy Code's intricate scheme for the payment of tax claims." Id. at 426. Rather, it would seem equally consistent with the "Code's intricate scheme for payment of tax claims" to assume that this scheme contemplated the use of bankruptcy rights as part of the activity which the IRS was expected to undertake during the time periods set forth in section 507(a)(7). At a minimum, the literal provisions of the Code are not demonstrably at odds with any unequivocal indication of Congressional intent.

170 B.R. at 60, fn. 2.

The fact is that, in most instances involving consumer debtors, the ability of the IRS to assess and collect taxes is not materially altered or hampered by the fact that the debtor is in Chapter 13. Often a Chapter 13 case facilitates the IRS's collection of taxes by providing a convenient method and structure for people with relatively low incomes and little property to devote the bulk of their income to the satisfaction of the taxes while avoiding the collection activities of nonpriority creditors and the payment of nonpriority debts.

### (1) Liens

 If the IRS were forced to find property on which collections could be based, it would find that the average Chapter 13 debtor rarely owns any property which is not either encumbered or exempt from levy for the payment of taxes under 26 U.S.C. § 6334.[6] If the IRS does find such property

---

**6.** The following property is exempt from levy and sale for the payment of federal taxes: (1) wearing apparel and school books; (2) personal effects of a value not exceeding $1,650; (3) books and tools of a trade, business, or profession of a value not exceeding $1,100; (4) unemployment benefits; (5) undelivered mail; (6) certain railroad and armed forces annuity and pension benefits; (7) workmen's compensation benefits; (8) so much of a taxpayer's salary necessary for him to satisfy a judgement for periodic child support; (9) a certain portion of a taxpayer's wages; (10) certain service connected disability payments; (11) certain public assistance payments; (12) certain payments under the Job Training Partnership Act; (13) the taxpayer's principal residence, unless a levy on the taxpayer's residence is authorized by the district director or assistant district director of the IRS or the collection of the tax is in jeopardy. 26 U.S.C. § 6334(a). No other property is exempt, even if the law of the state where the taxpayer resides provides more liberal exemptions from the collection of other debts. 26 U.S.C. § 6334(c).

and after the assessment of income taxes, and upon failure of the taxpayer to pay the taxes assessed after demand, the IRS has, pursuant to 26 U.S.C. § 6321, a lien on any unencumbered property that is owned by the debtor.[7] The lien encompasses all forms of property, personal and real, tangible and intangible. The same unencumbered property is subject to levy, distraint and sale pursuant to 26 U.S.C. § 6331, following assessment of the taxes, unless the property is exempt from levy under 26 U.S.C. § 6334.

 The IRS's rights in the assets owned by the debtor when bankruptcy is filed, are preserved by the lien, and cannot be effectively assailed, even if the debtor files bankruptcy, and even if the taxes are ultimately discharged in a Chapter 7 case.[8] As to a debtor's property, therefore, the IRS occupies the same position, whether the debtor is in bankruptcy or not, once assessment has occurred. In either situation, the IRS holds a lien on all of the debtor's unencumbered assets. Once in bankruptcy, the debtor cannot dispose of the property without the permission of the bankruptcy court, gained only after a hearing upon notice to lienholders, including the IRS, who would be entitled to adequate protection of its interest in the property to be sold. 11 U.S.C. § 363(e). Because of the shortage of property ordinarily owned by consumer debtors that is subject to the IRS's lien and levy rights, bankruptcy rarely deprives the IRS of actual levy opportunities.[9]

### (2) Assessments

 The IRS cannot be prevented from assessing taxes, and yet be faced with the anomalous situation of having the same taxes discharged in a subsequent Chapter 7. If the taxes have not been assessed before the Chapter 7 case, by reason of the automatic stay in a previous bankruptcy case, they would still be "assessable," and for that reason nondischargeable pursuant to 11 U.S.C. §§ 523(a)(1) and 507(a)(7)(A)(iii). The point which must not be overlooked is that if taxes have not been assessed, they are not dis-

---

The conclusion regarding the value of assets ordinarily owned by consumer debtors is based in part on the Court's own experience and observations, and also on the study and findings of well respected and recognized researchers on the subject. See Sullivan, Warren, and Westbrook, *Consumer Debtors Ten Years Later: A Financial Comparison of Consumer Bankrupts 1981–1991*, 68 Am.Bankr.L.J. 121 (1994) [hereinafter referred to as the "Consumer Bankrupt Study"]. The "Consumer Bankrupt Study" found that the median value of assets of, without deduction for liens and mortgages, for consumers in bankruptcy in 1991 was $16,765, while the median secured debt load of the same consumer bankrupts was $10,953. *Id.* at 128. The study also found that the median net worth of the same group of debtors was <$10,450>. *Id.* at 135. Regarding the latter figure, the study made the following observation:

It is, of course, unsurprising that the debtors' net worth does not rival that of the average American. After all, bankrupt debtors have declared themselves financial failures. It may be more instructive to compare the poorest Americans from the general population with the debtors who have declared bankruptcy. Here the comparison is equally bleak. Twenty percent of Americans report incomes of $10,000 or less. Among these people, mean net worth is $30,100 and median net worth is $2,100. Obviously, these low-income Americans have considerably lower net worth than most people in the general population. None-

theless, their net worth is still substantially higher than the net worth of the bankrupt debtors. Indeed, among the bankrupt debtors, 83% had a net worth below $5,000. Again, by yet another comparable measure, the debtors in bankruptcy are in terrible financial shape. 68 Am.Bankr.L.J. at 135.

An earlier study conducted by the same researchers based upon information regarding 1529 consumer debtors who filed bankruptcy in 1981, determined that on the average consumer debtors own two thirds less in assets than average American families. T. Sullivan, E. Warren, and J. Westbrook, *As We Forgive Our Debtors: Bankruptcy and Consumer Credit in America* 66–68.

7. The IRS's lien is generally subordinate to earlier perfected liens and security interests. 26 U.S.C. § 6323.

8. *See, e.g., In re Conner*, 27 F.3d 365 (9th Cir. 1994).

9. When evaluating the extent to which a particular debtor's property may be seized and sold to satisfy a federal tax debt, the IRS must consider the potential costs of transporting, storing, safeguarding, insuring, appraising, advertising and conducting the sale of the property subject to the levy. If the estimated expenses with respect to the levy and sale of particular property exceed the fair market value of the property, then levy is prohibited by 26 U.S.C. § 6331(f).

chargeable; if taxes have been assessed, the IRS has a lien on unencumbered property. The event of bankruptcy does not effect this maxim.

### (3) Bankruptcy

■ In Chapter 13, the IRS's rights and remedies are many, to include the right to move for relief from the automatic stay; the right to seek dismissal or conversion if the case was filed in bad faith; the right to receive priority payment and to be paid in full; the right to object to confirmation of the plan; the right to begin receiving payments promptly; the right, absent certain circumstances, to be paid over a period of less than three years, and the right to move for dismissal or conversion of the case if the debtor fails to make the payments provided for under the plan. Most plans involve some sort of wage deduction, so that the IRS can be assured that by simply filing a proof of claim, it will receive a check each month for as long as the debtor is in Chapter 13, or until the taxes are paid in full, without the necessity of resorting to more complicated and administratively onerous collection measures. The IRS can keep tabs on the debtor while he or she is in Chapter 13, and is privy to all necessary information regarding the debtor's finances by way of the bankruptcy petition, the bankruptcy court case file, the meeting of creditors and the Chapter 13 standing trustee. While levy, distraint and sale of the property is stayed by the bankruptcy, the IRS is, like any secured creditor, entitled to adequate protection to prevent erosion of the value of its interest in the debtor's property, and relief from the stay if adequate protection can not be provided or if the property is unnecessary for the debtor's reorganization effort. If relief from the stay is granted, or if the stay is lifted by operation of law, for instance, upon dismissal of a Chapter 13 case, then the property would still be available to the IRS by way of levy, distraint and sale.

### (4) Wages

■ Since most consumer debtor's lack property from which the IRS's taxes can be collected, the primary "assets" available to the IRS for the collection of the taxes are the debtor's wages. As to a debtor's wages, the IRS's vantage is also much the same, whether the debtor is in bankruptcy or not, once assessment has occurred. Outside of bankruptcy, the IRS may levy upon the debtor's wages to collect the taxes. The levy would then result in the nonexempt portion of the debtor's wages being paid directly to the IRS. In a bankruptcy, since the IRS must be paid all of its claim in a Chapter 13 bankruptcy, the debtor's plan is the functional equivalent of the nonbankruptcy levy. In fact, in order for the Chapter 13 plan to be confirmed, the debtor must show that he will be able to pay one hundred percent of his tax debt.

■ The amount of the wage levy exemption is calculated in such a manner that it is the same for all taxpayers who have the same number of deductions, regardless of income.[10] Therefore, a larger percentage of the income of a person in a lower income bracket will be exempt from levy than will the percentage of the income of a person in a higher income bracket. Since the incomes of most Chapter 13 consumer debtors are toward the lower end of the income spectrum, often the IRS will receive more in a Chapter 13 case during the same time period than it would by way of a levy on the debtor's wages outside of bankruptcy, because outside of

---

**10.** The amount exempt for wages paid weekly is an amount equal to the taxpayer's standard deduction and personal exemptions allowable for the tax year in which the levy occurs, divided by 52. For wages paid other than on a weekly basis, the amount exempt is an amount which as nearly as possible will result in the same total exemption as if the compensation was paid on a weekly basis. 26 U.S.C. § 6334(d). A handy table is available from the IRS to calculate the exemption, whether the wages are payable daily, weekly, biweekly, semi-monthly or monthly. IRS Pub. 1494. For example, from the table it can be determined that the exempt amount for a married taxpayer who files a tax return jointly with his or her spouse, and who claims four personal exemptions is $318.27 a week. A copy of the table can also be found in IRS Notice 94–100, *Table for Figuring Amount Exempt From Levy on Wages, Salary, and Other Income*, 1994–46 I.R.B. 12, 1994 WL 629461 (IRS).

bankruptcy a large portion of the low income debtor's wages would be unreachable.[11]

Certainly, in many Chapter 13 cases the payout will result in a slower satisfaction of the debtor's tax obligation than an IRS levy of the debtor's wages, as would payments to all other creditors. More likely than not however, that is the result intended by Congress, and this Court cannot presume that Congress intended to penalize debtors for using Chapter 13 as a vehicle for the payment of tax obligations by extending the time specified for the retiring of those taxes through a discharge in a subsequently filed Chapter 7 case. Furthermore, the construction adopted by this Court coincides with the IRS's expanded use of voluntary payment plans as a significant means of collecting taxes from consumer taxpayers, in accordance with the Taxpayer's Bill of Rights enacted in 1988.[12] The IRS commonly, and quite successfully, employs, pursuant to 26 U.S.C. § 6159(a), the use of voluntary time payment agreements for the collection of taxes as an alternative to involuntary, coercive measures such as levy.[13] Why then should a

11. Once again, the Court relies in part on its own experience and observations. In addition, the "Consumer Bankrupt Study" found the incomes of consumer debtors to be dismally low:

Based on our 1991 sample, the debtors in bankruptcy are in at least as much trouble as they were in 1981. Their incomes remain very low by national standards and have actually declined as compared with Americans generally. In 1981 the mean reported earnings were valued (in 1991 dollars) at $23,642. The median, or middle debtor was not far off with an income of $22,436. A decade later, our debtors' mean reported earnings were down to $20,535, a drop of about 13%. For the median debtor, income was down to $18,000, a drop of nearly 20%.

Despite their higher than average educations and their high rates of home ownership, which would have suggested a certain economic stability, a sizable portion of these debtors had incomes below the poverty level. The poverty level for a family of four in 1991 was $13,359, which put 29.4% of our 1991 bankrupt debtors in poverty. A decade ago 24% of our sample of debtors reported incomes below the poverty level. Thus our 1991 debtors are no better off and may actually be in worst shape than their 1981 counterparts.

Our data indicate that the incomes of bankrupt debtors have declined as compared to the general population, because real incomes have risen among Americans generally, while they have stayed the same or declined among bankruptcy petitioners. In 1981 nearly a quarter of the debtors earned above the then-current national median, and about half the debtors were sandwiched between poverty and the median. By 1991, the proportion of debtors with incomes above the national median had dropped. The median family income for 1991 was $35,938, but the cutoff level for the earnings for the top quarter of the 1991 debtors was $26,622. In fact, only 10.3% of the debtors in our 1991 sample had incomes that exceeded the national median, which reflects yet another way that incomes for debtors as a group have declined. In the 1981 sample, the median income of the debtors in bankruptcy was only two-thirds (66.8%) of the national median family income for the same year. The debtors sampled in 1991 had median incomes only half as great as the median of the national population. The implications of these data for the families struggling to make ends meet are sharpened when we recall that the 1981 data suggested that debtors in bankruptcy support larger households than most Americans and are trying to pay mortgages that are about the same as those owed by other homeowners. If those findings remain constant, debtors in bankruptcy are people who are trying to stretch small or sporadic incomes far beyond what is possible.

T. Sullivan, E. Warren, and J. Westbrook, *supra* note 5, at 129–130.

12. The IRS can extend the time for the payment of the deficiency assessed for a period of up to 30 months. 26 U.S.C. § 6161(b)(1). The IRS is also authorized by law to enter into an agreement with any taxpayer for the payment of taxes in installments, if the installment agreement will facilitate collection of the tax liability. 26 U.S.C. § 6159(a). Curiously, neither code section provides for the suspension of either the assessment or collection limitation as a prerequisite to or during the course of either extended payment period.

13. Since the enactment of the Taxpayer's Bill of Rights, Pub.L. 100–647, Title VI, §§ 6226 to 6247, Nov. 10, 1988, 102 Stat. 3730 to 3752, the IRS has sought to encourage, promote and facilitate the use of installment payment plans to collect tax deficiencies. Both IRS Pub. 1, *Your Rights as a Taxpayer*, and IRS Pub. 594, *Understanding the Collection Process*, describe, in easy to understand language, how taxpayers may avail themselves of the installment payment route. Pub. 1 is sent to taxpayers along with the first notice concerning the determination or collection of tax and Pub. 594 is given to taxpayers before enforced collection begins. IRS News Release, *The Collection Process*, April 1991, page 4 (located in Westlaw, database FTX-all, citation: FS–91–3).

Apparently, the IRS's expanded use of installment payment plans has met with a fair measure

Chapter 13 payment plan, which likewise contemplates the voluntary payment of taxes over time, be considered so onerous as to justify "tolling" bankruptcy dischargeability time periods, absent actual fraud or abuse on the part of the debtor, or actual prejudice to the IRS?

E. Application of Section 507(a)(7)(A)

■■■ The interplay between subsections (i), (ii), and (iii) of section 507(a)(7)(A) also requires the conclusion that the tolling provisions of I.R.C. § 6503 were not intended to effect section 507(a)(7)(A)(i) or (ii). When construing a statute, this Court is bound by the proposition that each part of the statute was intended for a certain purpose and is to be given effect. A statute must be construed so that no part is mere surplusage. *General Motors Acceptance Corp. v. Whisant,* 387 F.2d 774, 778 (5th Cir.1968). Subsections (i), (ii) and (iii) each have a distinct purpose.

(1) Subsection (iii)

■■■ Section 507(a)(7)(A)(iii) preserves the entire nonbankruptcy time period provided under the I.R.C. for the assessment of taxes. If a tax is still "assessable" under the I.R.C. when the bankruptcy case is filed, the tax is not dischargeable. If the nonbankruptcy time period is extended by virtue of any of the tolling events specified in 26 U.S.C. § 6503, then section 507(a)(7)(A)(iii) preserves the extended time period as well. Neither section 507(a)(7)(A)(i) nor section 507(a)(7)(A)(ii) was intended to preserve a period of time, either minimum or maximum, for the assessment of taxes. That is the function of section 507(a)(7)(A)(iii).

(2) Subsection (ii)

■■■ Section 507(a)(7)(A)(ii) preserves for the IRS a *minimum* time period of 240 days for the collection of taxes following assessment. The section 507(a)(7)(A)(ii) time period is limited, however, when compared to the nonbankruptcy limitation period for the collection of taxes following assessment, since the former may only be interrupted by an offer in compromise pending at some time during the 240 days. To add nonbankruptcy tolling provisions other than that relating to offers in compromise to section 507(a)(7)(A)(i) would frustrate the intent of Congress by expanding the period that must pass after assessment for taxes to be dischargeable.

It is important to recognize that more than 240 consecutive days has passed since the assessment of the taxes owed by the Debtor in this case; 240 consecutive days that the Debtor was not involved in a bankruptcy case. Between the date of the disposition of

of success, as indicated by the following magazine article:

> The Internal Revenue Service says collection policy changes designed to keep financially strapped taxpayers in the system are beginning to pay off.
>
> Its been over a year since the IRS instituted measures to make it easier for taxpayers to set up installment agreements and settle a tax debt at a reduced amount through offers-in-compromise.
>
> According to the IRS, the number of taxpayers with installment agreements and accepted offers-in-compromise has increased more than 30 percent.
>
> During the first six months of fiscal 1993, for instance, 698,655 taxpayers concluded installment agreements, compared to 536,006 for the same 1992 period.
>
> "Although it will take time to see the full impact of these changes," IRS Commissioner Margaret Milner Richardson said, "the early results indicate we have struck a responsive chord with people who want to meet their legitimate tax obligations, but have financial difficulty doing so. I think it shows taxpayers are willing to cooperate with us if we give them a chance."
>
> IRS statistics show that taxpayers entering installment agreements during the first six months of fiscal 1993 owed an average of $4,625, up 14 percent from the same period the previous year.
>
> Offers-in-compromise are also up sharply since the IRS gave its collections officers more authority to accept them. The agency enters into such settlements when it is unlikely that enforcement actions could collect more taxes than the settlement offer.
>
> Under the new installment agreement policy, the IRS now allows more of its employees to accept the agreements, including staff in Taxpayer Services and Examination. Also, for most debts under $10,000, the IRS no longer requires taxpayers to give financial statements and does not file tax liens, which means the taxpayers' credit rating is not affected.
>
> *Taxpayer installment plans yield big payoffs for IRS; payment of income tax through installments,* Accounting Today, Vol. 7, No. 14, July 19, 1993, at page 6.

the Debtor's last bankruptcy case, May 19, 1993, and the date of the present petition, 340 days passed. In fact, without including the days spent by the Debtor in previous bankruptcy cases, between the date the 1986 taxes were assessed and the date the present petition was filed, the IRS had substantially more time than that provided for by Congress in 507(a)(7)(A)(ii) to collect the taxes owed for each of the tax years in question, 1986 through 1989. Specifically, the IRS was not stayed by bankruptcy, or any other tolling event provided for in the I.R.C. for that matter, for a period of 1,282 days following the assessment of the 1986 taxes, for a period of 1,025 days following the assessment of the 1987 taxes, for a period of 640 days following the assessment of the 1988 taxes and for a period of 343 days following the assessment of the 1989 taxes. It would, therefore, be a gross understatement to say that the section 507(a)(7)(A)(ii) time period expired before the present petition was filed as to all of the tax debts owed by the Debtor in this case.

### (3) Subsection (i)

Section 507(a)(7)(A)(i) was intended to establish the *maximum* period for the collection of taxes before the taxes become dischargeable. Section 507(a)(7)(A)(i) does not entitle the IRS a guaranteed period of time to collect taxes, but instead, is a limitation on which taxes the IRS may collect. It says that the IRS, beginning on the due date of the tax return, has three years to both assess and collect as much of the taxes that it possibly can before the three years expires. At the end of the three year period the taxes become dischargeable in bankruptcy unless the taxes have not been assessed, or unless the IRS has not had the full "limited" 240 day period under [section] 507(a)(7)(A)(ii) to collect the taxes following assessment. Application of the tolling provisions of I.R.C. § 6503 so that the IRS is provided an unhindered window for collection after assessment which is longer than 240 days would circumvent the three year limitation and also render sections 507(a)(7)(A)(ii) and (iii) without purpose or effect. The Bankruptcy Code's definition of what taxes are dischargeable, that is those that were due more than three years before a bank-

ruptcy was filed, would be altered by the application of the procedural statute.

Congress could never have intended by way of section 507(a)(7)(A)(i) to insure the IRS three full years following assessment *to collect taxes,* that is, to levy on the debtor's property and wages. Almost always, the three year period provided for in that code section begins well before the taxes become collectible. Certain procedural steps must be taken by the IRS before it can begin the collection process. First, of course, as a practical matter, the IRS must receive, process and review the debtor's tax return to determine whether or not the debtor owes taxes over and above that shown on the return. Next comes correspondence between the IRS and the taxpayer regarding the examination of the taxpayer's return, followed by meetings and interviews, managerial review of the examiner's findings, and appeals of the examiner's findings to the IRS Appeals Office. *See* IRS Pub. 1, *Your Rights as a Taxpayer;* and IRS Pub. 594, *Understanding the Collection Process.* Upon a final determination being made by the IRS that the debtor owes a tax deficiency, the IRS must mail a notice of deficiency to the debtor. 26 U.S.C. § 6212(a). Within 90 days after the mailing of the notice of deficiency, the debtor may file a petition with the tax court for a redetermination of the deficiency. After the 90 day period expires, or after the decision of the tax court becomes final, in the event the debtor elects to petition for redetermination of the deficiency, the IRS may assess the taxes. 26 U.S.C. § 6213(a). Within 60 days after assessing the tax, the IRS must give notice to the debtor stating the amount of the tax and demanding payment. 26 U.S.C. § 6303(a). If the debtor does not pay the taxes within 10 days of the notice and demand, the IRS may levy on the debtor's property and wages. 26 U.S.C. § 6331(b). Levy may only be made on the debtor's wages and property, however, after the IRS has notified the debtor in writing of the intention to levy 30 days before the day of the levy. 26 U.S.C. § 6331(d). The miscellaneous notice provisions and time periods, as well as the inherent administrative difficulty of the task, will

almost always result in the IRS having less than three full years to *"collect" taxes.*[14]

If Congress had intended for the IRS to have three full years to *collect* taxes, rather than providing for three years for performing all the preliminaries to collection *along with* collecting the taxes, it would have drafted section 507(a)(7)(A) to provide simply that a tax is entitled to priority (and is therefore not dischargeable) if it is assessable or, if the tax has been assessed, that three years have not passed since the date of assessment. Again, of course, assessment is the essential prerequisite to collection under the Internal Revenue Code. That would allow the IRS a full three years to collect taxes. The section 507(a)(7)(A)(ii) 240 day post assessment period would then be unnecessary, as would the dischargeability proviso relative to taxes with respect to which a debtor filed a return late found in section 523(a)(1)(B)(ii).

In many instances, the IRS may be unable *to assess* the taxes early in the section 507(a)(7)(A)(i) three year period. Often assessment will occur one year, two years and even longer following the due date for the return. Only section 507(a)(7)(A)(ii) insures a "minimum" collection period for taxes following assessment of the taxes. If assessment occurs early enough in the three year period, section 507(a)(7)(A)(i), from the IRS's perspective, at best preserves a period for collection which might exceed the 240 day period found in subsection (ii).

It may be difficult, because of lack of time and the laboriousness of the tax collection process, for the IRS to collect a substantial amount of some tax debts within the time periods found in section 507(a)(7)(A). Congress, however, set the time periods in section 507(a)(7)(A) with full knowledge of the magnitude and importance of the IRS's job

and the intricacies and mechanics of the tax collection process, as well as the problems and difficulties faced by the IRS in collecting taxes. The conclusion is therefore inescapable that Congress intended to provide the IRS with only a very limited period of time for the actual collection of taxes by way of establishing a lien, the levy and sale of the debtor's nonexempt, unencumbered assets, and levy on the debtor's wages, before providing the debtor with the opportunity for permanent and unlimited relief from the tax debt. Section 507(a)(7)(A) is a balancing act, focusing both on the rights of the IRS and the relief of the debtor. To accept the proposition advanced by the IRS in this case would, in many instances, drastically upset that balance by, in effect, exposing the debtor to the activities of the IRS for a *greater* period of time than that intended by Congress, by adding to the section 507(a)(7)(A) time periods the time that the debtor has spent in bankruptcy, even if the debtor was engaged in a good faith effort to pay the IRS, even if the IRS was not actually prejudiced by the debtor being in bankruptcy, and even if the IRS was benefitted by the debtor being in bankruptcy. The forced combination of 26 U.S.C. § 6503, and 11 U.S.C. §§ 108, 523, and 507, therefore, in many instances, will result in a "Catch-22" for consumer debtors and an unintended windfall for the IRS.[15]

### F. Fresh Start

"The whole point of bankruptcy is to provide a debtor with a fresh start." *In re Folendore,* 862 F.2d 1537, 1540 (11th Cir. 1989). An interpretation of sections 108(c), 507(a)(7)(A) and 523(a)(7)(B) of the bankruptcy code, and section 6503(h) of the Internal Revenue Code, in a manner that would extend application of the nonbankruptcy tax

---

14. A good description of the steps, procedures and time involved in the process can be found in IRS Pub. 1, *Your Rights as a Taxpayer;* and IRS Pub. 594, *Understanding the Collection Process.* Especially helpful is the flow chart located on the second page of Pub. 1.

15. There was only one catch and that was Catch-22, which specified that a concern for one's own safety in the face of dangers that were real and immediate was the process of a rational mind. Orr was crazy and could be

grounded. All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions. Orr would be crazy to fly more missions and sane if he didn't, but if he was sane he had to fly them. If he flew them he was crazy and didn't have to; but if he didn't want to he was sane and had to. Yossarian was moved very deeply by the absolute simplicity of this clause of Catch-22 and let out a respectful whistle.
Joseph Heller, *Catch-22,* chapter 5, p. 46 (1961).

collection tolling provisions so as to increase the time periods that otherwise must pass to result in the discharge of taxes and tax penalties, would not only contradict the plain language of each of those statutes, but would also serve to frustrate the fresh start policy of the bankruptcy code. This Court will therefore follow the lead of the Court of Appeals of the Eleventh Circuit decision in *In re Burns* and the Court of Appeals of the Fifth Circuit decisions in *In re Quenzer,* and in *U.S. v. Verlinsky,* 459 F.2d 1085 (5th Cir.1972), in which the court, in interpreting 26 U.S.C. § 6503(b), which, before section 6503(h) was enacted, was interpreted to govern the suspension of nonbankruptcy limitations for the assessment and collection of federal taxes during bankruptcy proceedings, stated:

> Insofar as § 6503(b) relates to a bankruptcy proceeding, we refuse to interpret it in a fashion that would delay the hour when a man could finally divorce himself from his former holdings and debts. To do so would undermine the very purpose and policies of the Bankruptcy Act itself and jeopardize this circuit's commitment to letting the bankrupt start afresh.

459 F.2d at 1088.

## V. EQUITABLE TIME SUSPENSION

### A. Taxes

■ Chapter 13 ordinarily provides a relatively quick and efficient method for debtors to retire their debts. Despite the safeguards built into the system and the due diligence in the exercise of those safeguards by creditors, Chapter 13 sometimes results in undue delay and unrealized expectations. This Court cannot find that Congress intended the "tolling" provisions of [sections] 108(c) and 6503(h) to extend the time periods specified under [sections] 507(a)(7)(A)(i) and (ii). If Congress intended for the IRS to have a maximum of three years from the filing of an income tax return and a minimum of 240 days from the date of assessment of income taxes to pursue the collection of taxes assessed before bankruptcy, whether as part of the bankruptcy process or outside of bankruptcy, before the income taxes become dischargeable, the simple fact that the debtor was involved in a previous bankruptcy case during the time periods specified under [sections] 507(a)(7)(A)(i) and (ii), does not necessarily frustrate that Congressional intent. If, however, the safeguards provided by Congress in Chapter 13 prove insufficient to prevent deterioration of the IRS's position in a particular case, so that the case serves to frustrate materially the intent of Congress by effectively minimizing the section 507(a)(7)(A)(i) and (ii) time periods, and discharge of the debtor's income taxes in a subsequently filed Chapter 7 case would, consequently, be inequitable, this Court may exercise its equitable power under 11 U.S.C. § 105 to add the time that the IRS was actually enjoined by the automatic stay in the prior bankruptcy case from proceeding against a debtor to the time periods specified under 507(a)(7)(A)(i) and (ii), for the purpose of determining whether a particular income tax obligation is nondischargeable under section 523(a)(1). *Accord, In re Richards,* 994 F.2d 763, 765 (10th Cir.1993); *In re Eysenbach,* 170 B.R. 57, 59 (Bankr.W.D.N.Y.1994); *see, e.g., In re Quenzer,* 19 F.3d 163, 165 (5th Cir.1993).

■ The mere existence of sections 108(c) and 6503(h) does not *ipso facto* compel the invocation of equity. As stated by the court in *Eysenbach:*

> Section 105 of the Bankruptcy Code provides that this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11]." As a court of equity, this Court possesses general equitable powers which it may invoke in furtherance of the various provisions of the Bankruptcy Code. See *United States v. Energy Resources Co.,* 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990). The Internal Revenue Service argues that the Bankruptcy Court may exercise these equitable powers to toll the time limits for determining the priority status of tax obligations where collection may have been delayed due to the pendency of a prior proceeding in bankruptcy. This Court wholeheartedly agrees. As stated by the Tenth Circuit in *In re Richards,* 994 F.2d 763, 765 ([10th Cir.] 1993), "11 U.S.C. § 105(a) is broad enough to

permit the Bankruptcy Court's order to suspend" the time periods that are set forth in section 507(a)(7). That the court may exercise this authority, however, does not settle whether such authority should be exercised in any particular circumstance. As a court of equity, this Court must administer equity and must accordingly look to safeguard the rights of all parties.

170 B.R. at 60.

This Court may use its inherent equitable powers pursuant to section 105 only if the facts of this case constrain the application of equity. "Full development and examination of the facts and the relative positions of the parties are imperative in the exercise of the court's equitable powers." *In re Quenzer*, 19 F.3d at 165. The issues addressed in this memorandum were submitted upon stipulations of the parties and the arguments of counsel. From the stipulations, and the statements made by the respective attorneys at the hearing, it is clear to this Court that the parties did not know that the relative equities between them was at issue. Consequently, the parties must be given sufficient opportunity to address the issue and present testimony and other evidence regarding the same, so as to provide this Court with the facts necessary to make a determination regarding the equities of the case.

### B. Penalties

May equity be invoked pursuant to section 105 to extend application of the tolling provisions of section 108(c) and section 6503(h) to section 523(a)(7)(B)? Considering equity's historic abhorrence to penalties, the answer must be no. "A bankruptcy court is essentially a court of equity and will therefore not enforce a penalty." *In re Black Ranches, Inc.*, 362 F.2d 8, 15–16 (8th Cir.1966), *citing, In re Tastyeast, Inc.*, 126 F.2d 879, 881 (3rd Cir.1942), *cert. denied*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766. "[T]he penalty provisions in the tax code are expressly meant to deter and punish: two goals in contravention of any equity or equitable considerations." *In re Virtual Network Services Corp.*, 902 F.2d at 1249. Clearly then, equity should not act to avoid or delay the destruction of a penalty pursuant to section 523(a)(7)(B) in

the absence of express statutory language dictating that result. "Equity certainly cannot be used to impose a penalty when Congress did not intend one." *In re Davis*, 889 F.2d 658, 662 (5th Cir.1989).

Because the transactions which gave rise to the penalties owed by the Debtor in this case, the 1986 through 1989 tax returns due on April 15, 1987, April 15, 1988, April 15, 1989, and April 15, 1990, occurred more than three years prior to the filing of the bankruptcy petition in this case, the penalties are dischargeable, and will be discharged if and when a discharge is granted in this case. *In re Burns*, 887 F.2d at 1544. Further hearings in this matter, if there are any, will therefore not involve any issues regarding the dischargeability of the tax penalties.

## VI. CONCLUSION

Much of the above discussion addresses the theoretical basis for the IRS's position in this case. More importantly however is how the specific facts of this case relate to that position. To erase any question that this case was decided on theory and not facts, in the absence of a presentation of any additional facts as discussed above, this Court finds the following:

### A. Taxes

The Debtor's first Chapter 7 case which lasted only 92 days can barely be considered a de minimus hindrance to the IRS's efforts to collect the 1986 taxes. There is no indication that the Debtor owns nonexempt, unencumbered property that can be levied upon by the IRS or owned nonexempt, unencumbered property at any time between the date the assessment of the 1986 taxes was made and the filing of the present Chapter 7 case. In fact, the Debtor's present Chapter 7 is a "no asset" case, as was the Chapter 7 case that was filed by the Debtor in 1988. The IRS can scarcely argue that it was hindered from collecting the taxes by the Chapter 13 case filed in 1990. Most of the sum that has been paid by the Debtor ($6,739 out of a total of $7,969) to the IRS was paid through the plan in that case.

The IRS has had ample time and opportunity to collect much of the taxes from any

nonexempt, unencumbered property owned by the Debtor at the time of or acquired by the Debtor following the respective tax assessments, and from any wages earned by the Debtor following the respective tax assessments and prior to the institution of the present Chapter 7 case. The return for the Debtor's 1986 taxes became due on April 15, 1987 and the taxes were assessed on June 1, 1987. The present bankruptcy case was filed 2,566 days after the return due date and 2,520 days after assessment of the taxes. The Debtor's intervening bankruptcy cases endured for a total of 1,238 days. The IRS was free to assess and collect the 1986 taxes for 1,328 days after the due date of the 1986 return and to collect the taxes for 1,282 days after assessment of the taxes.

The return for the Debtor's 1987 taxes became due on April 15, 1988 and the taxes were assessed on May 16, 1988. The present bankruptcy case was filed 2,201 days after the return due date and 2,171 days after assessment of the taxes. The Debtor's intervening bankruptcy cases endured for a total of 1,146 days. The IRS was free to assess and collect the 1987 taxes for 1,055 days after the due date of the 1987 return and to collect the taxes for 1,025 days after the assessment of the taxes.

The return for the Debtor's 1988 taxes became due on April 15, 1989 and the taxes were assessed on June 5, 1989. The present bankruptcy case was filed 1,836 days after the return due date and 1,786 days after assessment of the taxes. The Debtor's intervening bankruptcy cases endured for a total of 1,146 days. The IRS was free to assess and collect the 1988 taxes for 690 days after the due date of the 1988 return and to collect the taxes for 640 days after the assessment of the taxes.

The return for the Debtor's 1989 taxes became due on April 15, 1990. The present bankruptcy case was filed 1,471 days after the return due date and 1,429 days after assessment of the taxes. The Debtor's intervening bankruptcy cases endured for a total of 1,128 days. The IRS was free to collect the 1989 taxes for 343 days after the due date of the 1989 return and the assessment of the taxes.

The IRS did not act during the time that the Debtor was not in bankruptcy. As a consequence of their failure to act, the IRS allowed the time periods provided for under sections 507(a)(7)(A) and 523(a)(7)(B) to pass, and did not pursue the collection of the taxes under the Internal Revenue Code during the time that the debtor was not in bankruptcy. The IRS should not now be allowed to complain that the time has passed and that it should have more time to collect the taxes.

The taxes owed by the Debtor to the IRS are for taxable years for which returns were last due after three years before the date the petition in this case was filed, and were assessed more than 240 days before the date the petition in this case was filed. The taxes are therefore not exempt from discharge under 11 U.S.C. § 727.

■ However, in regards to the taxes (but not the tax penalties), equity may be invoked by this Court to avoid any injustice which may have resulted to the IRS as a result of any dilatory or bad faith conduct on the Debtors' part in filing or prosecuting their previous Chapter 13 case, or as a result of failure of the safeguards built into the Bankruptcy Code to reasonably protect the ability of the IRS to collect taxes in the manner and extent provided for therein. While the facts which have been stipulated to by the parties and which the Court is able to glean from the record in this case and the arguments of counsel do not indicate, on their face, a situation appropriate for the application of equity, this Court is of the opinion that the IRS should have the opportunity to prove facts that might lead to a different conclusion, if it so desires, since the parties apparently were unprepared to address possible equitable issues at the previous hearing. Therefore, if the IRS makes a written request for an evidentiary hearing within ten days following the entry of this order, the Court will reset this matter to hear evidence and argument from both parties on the issue of the equitable tolling of the time periods of section 507(a)(7)(A)(i) and (ii).

## B. Penalties

The tax penalties owed by the Debtor to the IRS were imposed with respect to events that occurred more than three years before the date the petition in this case was filed. The tax penalties are therefore not exempt from discharge under 11 U.S.C. § 727.

This Memorandum Opinion constitutes this Court's findings of fact and conclusions of law and is consistent with the similar opinion entered this same day in *In re Gore*, 182 B.R. 293 (Bankr.N.D.Ala.1995).

A separate order will be entered contemporaneously with this opinion.

### ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

In conformity with and pursuant to the Memorandum Opinion entered contemporaneously herewith, it is ORDERED that:

1. The Debtor's income taxes for the years 1986, 1987, 1988, and 1989, and any interest associated with those taxes, are dischargeable.

2. The tax penalties associated with the Debtors' income taxes for the years 1986, 1987, 1988, and 1989 are dischargeable.

3. Should any party desire an evidentiary hearing on any equitable issue, the requesting party must make the request for an evidentiary hearing in writing and file it with the Clerk of Court within 10 days from the date of this order. If no request is made, the Court will consider all matters concluded. If a request is made, the Clerk of Court is directed to schedule appropriate hearings at the convenience of the parties and the Court.